## SOUTH CAROLINA STATE HIGHWAY DEPARTMENT et al. v. UNITED STATES.

### Civil Action No. 1787.

District Court, E. D. South Carolina, Charleston Division.

June 15, 1948.

See also 78 F.Supp. 594.

John M. Daniel, Atty. Gen. of South Carolina, Huger Sinkler and Augustine T. Smythe, both of Charleston, S. C., and Helms & Mulliss, of Charlotte, N. C., for plaintiffs.

Ben Scott Whaley, U. S. Atty. and Moore & Mouzon, all of Charleston, S. C., for defendant.

WARING, District Judge.

This suit is brought under the Federal Tort Claims Act, 28 U.S.C.A. § 931 et seq. One of the plaintiffs is The South Carolina State Highway Department, created by Act of the General Assembly of the State of South Carolina, Code of South Carolina 1942, Sec. 5867. Section 5925-3 of this Code authorizes the Department to institute suit as plaintiff on behalf of the State by reason of the injury (inter alia) to any "bridge" in the State Highway system. The suit is based upon the alleged injuries and damages caused by the collision of a vessel owned by the United States with a bridge situate in the County of Charleston across the Cooper River, connecting the City of Charleston with that section of the County known as Christ Church Parish and known as "John P. Grace Memorial Bridge," or more commonly referred to as "Cooper River Bridge." It is stipulated and agreed that this bridge is a part of the State Highway system and in February 1946 it was operated as a toll bridge.

The plaintiffs are the above named The South Carolina State Highway Department, hereinafter referred to as Highway Department, and certain insurance companies which have made payments to the Highway Department upon policies of insurance covering physical injuries and loss of tolls as more fully hereinafter set out and explained, and these companies are joined with the Highway Department in the claim against the United States to the extent of their payments by way of subrogation. At the beginning of this suit the defendant, The United States, moved to dismiss that portion of the complaint stating a cause of action for these insurance companies, which motion has been refused in a separate opinion and order, 78 F.Supp. 594, and I have allowed the insurance companies to appear and be joined with the Highway Department in the prosecution of the cause and to be awarded judgments to the extent of their proof.

The defendant The United States is and was the owner of the Steamship Nicaragua Victory. This ship is one of the class known as victory ships, many of which have practically the same design and were constructed by and for the United States Government as a result of World War II. The Nicaragua Victory is a ship of 455 feet in length, 62 feet beam, and burden of 10,000 tons, and is equipped with a General Electric 8500 horsepower steam turbine engine which is capable of driving the ship at a speed of 18 knots per hour. At the time of the collision with the bridge the vessel was light and her freeboard forward was 40 feet.

This ship came into Charleston harbor in the month of February 1946, under the command of Captain Ivar H. Rosenquist, and proceeded up the Cooper River and discharged her cargo. On Friday, February 22, the ship, with no cargo aboard,

moved down to what is known as the Columbus Street Terminals and there discharged dunnage. It was intended that she should go into the dry dock of the Charleston Shipbuilding and Dry Dock Company and on Sunday morning, February 24, she moved down stream and anchored opposite this dry dock. But soon information was received that the dock would not be available until the next morning.

It appears that the harbor was somewhat crowded with shipping and this vessel had anchored in the near vicinity of a Government LST. Although somewhat close, ample room had been allowed for the swinging of the vessels on their anchors, but it appears that with the turn of the tide in the early afternoon, this LST dragged her anchor and collided with the Nicaragua Victory. Little if any damage was done. Owing to this situation, it was then determined to move the vessel to another anchorage until the next morning, and accordingly she moved under her own power in a general northerly direction up the Cooper River and passing under the Cooper River Bridge anchored about a half mile upstream above the Bridge. The ship was secured by its port anchor, which weighed approximately 9400 pounds, and 5 shackles (15 fathoms each) of chain were let out. The ship came to anchor at approximately 3 o'clock in the afternoon. Sometime between 3:30 and 4 o'clock a violent storm came out of the northwest and the ship was discovered to be drifting and did drift down the River and crashed into a portion of the supports of the easternmost part of the Bridge, causing the fall of three spans which were approximately 75 feet in height and the shearing off of a portion of the concrete base.

This suit is based upon the allegation of negligence by the officers, crew and employees of the Nicaragua Victory, and the defense is Act of God and unforeseen, sudden and violent weather conditions.

A large number of witnesses appeared, including the Master of the vessel, a number of members of the crew, both deck and engine room, and the "Night Mate," a temporary employee while the vessel was in port. There were many sharp conflicts and contradictions in the testimony of those aboard the vessel. In addition, there were a large number of other witnesses, some of whom my be said to have had some interest in the matter by reason of connection either with the business of the ship or of the operation of the Bridge. Another large group of persons testified who were apparently wholly disinterested and also some technical and expert witnesses, such as those having had experience in the operation and command of vessels, pilots, weather bureau and aeronautical employees.

Of those aboard the ship, the defense relied mainly upon the testimony of Captain Rosenquist, its commander; and Captain William L. Wurthmann, the Night Mate. Captain Wurthmann is a retired seafaring man who formerly followed the sea in various occupations and who spent many years in the service of the Coast Guard. He holds an unlimited first mate's license and a master's coastwise license. Some years ago he retired from the Coast Guard Service and has on numerous occasions acted as night mate aboard vessels arriving and staying in this harbor. Generally speaking, the position of Night Mate, under these circumstances, is somewhat of the nature of an experienced watchman in charge. The position is created and filled for the purpose of allowing the officers of the ship some relaxation from duty and the opportunity to have shore leave if desired.

Captain Wurthmann testified that he went aboard the ship approximately 5 p. m. Friday, February 22, 1946, and stayed on continuous uninterrupted duty, without relief or sleep, until the time of the collision with the bridge at approximately 4 p. m. on Sunday, February 24, a period of some 47 hours. The Chief Engineer of the vessel, the Boatswain, and other members of the crew also testified on behalf of the defense. Five other members of the crew testified on behalf of the plaintiffs. Their testimony in many important respects is diametrically contradictory of that of the defense as to the weather and conditions aboard the ship and its management.

As in many marine accidents, it is extremely difficult to create a true picture from the materials furnished by the testimony of the members of the crew of the vessel affected. The officers and some

members of the crew being in charge and responsible for what happened, their testimony must be weighed with considerable circumspection, for, if blame be placed upon the vessel, the blame rests squarely upon their shoulders. On the other hand, those members of the crew who testified on behalf of the plaintiff are said by the defense to be disgruntled seamen. It appears that they belong to a seaman's union which was not on friendly terms with the operators of this vessel and that they had been signed on only after reaching the Port of Charleston and just before the ship was moved and that they left the vessel a day or two afterwards. According to their testimony the ship was badly managed, the officers incompetent and one of them, the First Mate, in a drunken condition. Their testimony is denied in all of its important parts by the above referred to officers and members of the crew who were called by the defense.

The theory of the plaintiffs is that the weather was becoming bad on the afternoon of February 24, that dark clouds were apparent in the northwest, the wind was freshening, the barometer dropping, and that any prudent seaman should have realized the imminence, the possibility, nay, rather the probability of a severe blow and storm. To sustain this, they produced numerous witnesses from various walks of life, some of whom were in the City of Charleston and others in the outlying country, some of whom had intended to cross the Cooper River Bridge that afternoon and some of whom did. The testimony of some of them is that they refrained from crossing the bridge, that they realized that traffic would be impeded, apprehended bad weather, storms, and imminent danger, and it is claimed that what was clearly apparent to them could and should have been apparent to any one keeping a careful observation of the weather and being exposed to it. On the other hand, the defendant has produced testimony to the effect that the weather was not at all alarming and that the winds were gentle, the water calm, and although there were clouds, they were not menacing, and that this storm broke with unexampled suddenness and fury, coming out of the northwest without warning and striking the ship and almost instantly heeling her over 10 to 15 degrees. Their testimony is that the ship immediately began to drift, dragging her anchor, and that everything possible was done to forestall the collision with the bridge but that in a matter of a very few minutes the ship moved down the river rapidly and that the collision was wholly unforeseen, entirely unavoidable, and in no way chargeable to any neglect or negligence of either commission or omission.

Under the Code of Laws of South Carolina, Chapter 141, Sections 6682–6726-7, inclusive, a vessel crossing over the bar and coming in or going out of Charleston Harbor is required to employ a licensed pilot. A limited number of pilots are licensed and there are numerous provisions relative to their conduct and responsibilities. Pilots, according to their experience and examination, acquire different types of licenses and after passing through an apprenticeship become full branch pilots, receiving first a 15-foot license or branch; that is to say, permission to pilot a vessel of draft of not more than 15 feet. If qualified, they may be later promoted to a 20-foot license or branch, and later a full, that is, unlimited, license or branch. While no unlicensed person is allowed to conduct and pilot any vessel over the bar when coming into or going out of port, nevertheless, when a vessel is inside of such bar, the Master is not compelled to take a pilot. (See Sec. 6710) However, a pilot may be so employed and if and when a master voluntarily engages a pilot, the pilot is to be deemed the servant of the master or shipowner, and the ship will be responsible for the pilot's acts. See Homer Ramsdell Transportation Co. v. La. Compagnie Generale Transatlantique, 182 U.S. 406, 21 S. Ct. 831, 45 L.Ed. 1155.

The Master of the Nicaragua Victory engaged a pilot to supervise the moving and placing of this vessel. This pilot was Henry W. Lockwood, Jr., who held a 20-foot branch license. While the Pilot Lockwood, under these circumstances, must necessarily be viewed somewhat in the light of being an interested witness, never-

theless, he appears to be a competent young pilot, performing his duties generally in a satisfactory manner and telling the facts as he saw them. He performed his regular services, moving the ship from its place opposite the dry dock, anchored it in a recognized and often used anchorage place, and directed - the dropping of the anchor and letting out of sufficient chain. He does not seem to have taken any particular note of the weather, saying that he saw nothing unusual or imminent and he and the Captain quickly left the ship and came ashore. But on the other hand, it was shown that not long before that, Captain Igoe, a very experienced pilot of long standing in Charleston, brought in another ship, namely, the Anthony Dvorak; and he stated categorically that while the wind and weather were then satisfactory, nevertheless, he saw signs of a possible approaching storm and before leaving that vessel warned the master that he had better keep an eye to the weather and stand by to take such actions by additional anchor or engines as might be necessary if there should be a change for the worse. And while it might be said that the anchorage selected for the Nicaragua Victory was recognized as having a good holding bottom and not crowded, nevertheless, it would seem that one who anchors but a short distance above and to windward of a bridge, with a very strong ebbing tide, would be required to be especially alert. While there were other vessels anchored in the lower part of the river, they were movable objects and the possibility of a collision with a vessel can hardly be considered as serious as the possibility of drifting down with the tide before an oncoming wind into a great concrete and steel bridge such as is the Cooper River Bridge. And while it may be said that when the pilot and the Master left the vessel there was not enough to cause them to be apprehensive, nevertheless, with the barometer dropping, the wind blowing at least 20 miles per hour, considerable cloudiness in the northwest, and according to disinterested witnesses very distinct and decided appearances of an oncoming storm, a very prudent man might well have acted as Captain Igoe did and warn those in charge

of the vessel to be on the alert and to be ready to take steps for safety by an extra anchor or by use of engines or both.

The Master of the vessel, Captain Rosenquist, seems to have been quite anxious to get ashore. He testified that his family had joined him in Charleston and he and they were staying at the Francis Marion Hotel. He came ashore very shortly after the vessel anchored off the dry dock. He testifies that he had a room on the eastern side of the hotel which overlooked the Cooper River and he saw from there the collision between the LST and his vessel and he called a pilot and went down and moved the vessel above the bridge. Almost immediately he again left and went ashore. He testifies that when he landed about 3:30 the weather was fine and that there was no rain. In this he is distinctly contradicted by the weather reports of the Charleston Weather Bureau situate at the Custom House, but a short distance from the place where Captain Rosenquist landed. The Captain says he went to the hotel in a taxicab, which is some distance from the waterfront, and the rain did not come up until he had arrived there. He states that he went to his room and almost immediately looked out of the window, saw his ship lying apparently safe and sound and no bad weather to worry about; and then being thus thoroughly satisfied with the situation in about 5 minutes he went back to take another look and saw that his ship was drifting. A wind and rain storm had come up and he could not see just what had happened to the ship but he rang up the pilot's office, saying something was wrong, and when he got to the wharf and to the ship he found she had collided with the bridge and described the situation in which she was lying.

Probably the most important witness for the defense was the Night Mate, Captain Wurthmann. Captain Rosenquist testified that Wurthmann had come aboard on Saturday morning, but Wurthmann himself stated that he had gone aboard the vessel about 5 p. m. Friday afternoon. It is fair to assume that Wurthmann must know when he actually reported and served. As heretofore stated, he testified that he

remained on duty continuously without relief or sleep or any break in his vigil from the time he went aboard until the time of the collision; that is to say, about 4 o'clock Sunday afternoon. The law has recognized the fact that human beings are not in the best of physical condition when unduly fatigued and that the human frame and brain require a certain amount of rest. And many laws have been enacted limiting hours of service in various classifications of business and labor. In keeping with this, the United States has adopted statutes in regard to hours of service aboard ship. Title 46 U.S.C.A. § 235 is as follows: "Watch duty of deck officers. It shall be unlawful for the master, owner, agent, or other person having authority to permit an officer of any vessel to take charge of the deck watch of the vessel upon leaving or immediately after leaving port, unless such officer shall have had at least six hours off duty within the twelve hours immediately preceding the time of sailing, and no licensed officer on any ocean or coastwise vessel shall be required to do duty to exceed nine hours of any twenty-four while in port, including the date of arrival, or more than twelve hours of any twenty-four at sea, except in a case of emergency when life or property is endangered. Any violation of this section shall subject the person or persons guilty thereof to a penalty of $100."

From the foregoing, it will be seen that the Master was not complying with the laws of the United States when he allowed this Night Mate to remain on duty in excess of 9 hours. All parties testified that Captain Wurthmann's duties were to relieve the other officers and that he was actually in charge of and in command of the vessel. Since the Master, Captain Rosenquist, had allowed this violation of law, a burden is imposed upon the vessel of showing that the violation of law not only "probably did not but that it could not have contributed" to the collision. The Denali, 9 Cir., 105 F.2d 413 (Certiorari Denied Alaska S. S. Co. v. Pacific Coast Coal Co., 311 U.S. 687, 61 S.Ct. 65, 85 L.Ed. 444).

This puts a very high degree of responsibility upon the vessel to clear itself from negligence, since one fact that is established beyond contradiction is that Captain Wurthmann was in command and in full and complete charge of the vessel, although the testimony as to almost every other fact seems to be tinged with uncertainties by reason of contradictions.

Captain Wurthmann's testimony is that the day was fine and there was nothing to apprehend. He stated that he had noticed clouds about 3:30 o'clock which he concluded to be rain clouds only and that when he came on the boat deck he noticed that they were somewhat blacker but he concluded they portended only a shower. He was careful to sight ranges and definitely fix the place of anchorage, and when he came down from the bridge he walked up and down the boat deck, frequently checking his ranges and ascertaining that the boat was not drifting or that anything was wrong. He testifies that the weather continued fine, without excessive wind and without any rain. Again we call attention to the report of the Weather Bureau that rain started about 3:30 at the Custom House and the rain was coming out of the northwest so that it should have reached the vessel before it reached the Weather Bureau. (It was suggested that Captain Wurthmann's descent from the bridge to the boat deck was because the latter place was better shelter from the rain. But after all, this is only surmise.) The witness testifies that the first warning he had of any kind of approaching storm was when the vessel heeled over at about 10 or 15 degrees in a sudden burst of wind, that he was temporarily thrown off his balance; and the first thing he did was to look at his watch and check the time and it was 3:55 p. m. The wind swung the head of the ship until she was pointing in an east northeast direction, and that exposed her side, with its high freeboard, to the force of the wind coming from the northwest, and the witness estimated this wind at about 75 miles per hour. He again checked the ranges and the anchor chain was vibrating and he concluded that the ship was drifting. He stated that he had instructions from the Master that in case of high winds or drifting the second anchor should be dropped. Although in command of the

vessel, Captain Wurthmann did not issue any orders. No deck crew or engine crew had been alerted or were standing by. He testifies that he ran to the Chief Mate's room, called to him that they had better get out another anchor and that the Mate went forward with the boatswain and the starboard anchor was dropped. It is definitely established that no communication or orders were given from the officer in command, or any deck officer, to the engine room. This is established first by Captain Wurthmann's own statements and next by the testimony of the Chief Engineer who stated that he came on deck about the time the storm broke and that he of his own accord ran below to see about the engines. Additional verification of this fact is the engine room log and also the bell book, both of which are in evidence and show no communication from the bridge to the engine room subsequent to the anchoring of the ship. So that while it is a debatable question as to whether the collision could have been avoided by the use of the engines, it is definitely established that no effort was made by the commander of the vessel to use the engines or even get them ready. Captain Wurthmann testified that the starboard anchor went over about a minute and a half after he had called to the Mate. Some members of the crew testified that the anchor actually went over about the same time the ship hit the bridge. It is practically impossible to determine just when it was dropped.

There was a great deal of testimony in regard to the propriety of the use of the engines and as to whether they should have been put in operation and what would have been the effect of such action. It is well established that turbine engines require some time to be put in operation, depending upon the condition in which they have been kept after a ship is anchored. If it is contemplated a ship will be moved within a short period of time, the engines are kept slowly rotating back and forth, which will cause the ship to move slightly forward and then slightly aft. Of course the reason for this is that turbine engines must be kept at a proper degree of heat and that the sudden injection of high pressure steam into a cold turbine is liable to injure the latter and perhaps actually put it out of commission. So when it is expected that the engines will not be needed again for a while but will be needed within a reasonably short time, the usual method is to insert a jacking gear which has the effect of allowing the turbine blades to revolve slowly and keep the turbine well heated without causing the propeller to be rotated or the ship to be driven forward or backward. It takes some time to remove the jacking gear when it is desired to put the engines back into commission. This time will vary according to the alertness of the crew and the emergency. The First Engineer testified that it will take 5 minutes or perhaps somewhat more under ordinary circumstances, but if the engine room crew were alerted and in readiness, it could probably be done in 3 minutes. The engine room crew had not been alerted and were not in readiness. The First Engineer states that when he felt the storm hit the ship, he immediately went to the engine room and gave orders. They had time enough and no more to remove the jacking gear; and steam had not yet been turned into the engines, though they were about to do so, when he received word that the ship had collided. Of course a large portion of the bridge had actually fallen on the vessel and the engines would have been useless as things then stood.

There was considerable testimony by various seafaring men (some expert and some apparently quite inexpert) as to what effect the engines would have had had they been started before the collision. For the defense there was testimony that the starting of the engines would have been useless since the wind had driven the bow of the ship over to the eastward and the ship lying across the wind would not have been able to have gotten any headway. With equal positiveness it was testified that headway could be gained and that if the engines had been started promptly with full speed ahead, the ship should have swung into the wind, the anchor chains acting as a spring line, even though they were dragging, and that even if this effort had failed and the ship had not swung around,

she at least would have been driven forward into the shoreline, consisting at that point of mud and marsh flats, and that her bow would have been driven so high up on shore as to seize and hold tight, or if slipped back into the water, the shore line would have caused her bow to swing around.

It is interesting and fascinating to speculate on what would, should and could have happened in connection with the use of the engines. Perhaps the starting of the engines would have saved the ship and the bridge. Perhaps it would have been quite useless. But it seems to me that the effort should have been made and that a prudent, vigilant, wide-awake commander would have at least tried to make this effort. Captain Wurthmann and Captain Rosenquist said it would have been no use in doing this, but it must be remembered that they were the parties who failed to do it. Other witnesses who have long followed the sea and had no interest in this matter said that they would have undoubtedly tried the engines, and that they believed the use of the engines would have avoided the catastrophe. A prudent man should not only do but should try to do everything under the circumstances that might or possibly could save the situation, especially where large property interests and life and limb were in great jeopardy.

The Weather Bureau (United States Department of Commerce) Report for February 24, 1946, is in evidence. This shows the observations taken at the Weather Bureau Station in the City of Charleston, situate in the United States Custom House, which is on the Cooper River waterfront and approximately a mile and a half below the Cooper River Bridge. According to this report rain began falling at 3:30 p. m., which is in distinct contradiction of Captain Rosenquist's testimony. It is fair to assume that since rain was observed at the Custom House, it should have been observed by Captain Rosenquist, who came in a launch from the ship and necessarily passed the Custom House to make his landing at the point where he came ashore. The weather report shows the direction of the wind to have been northwest and indicates that from the period of 3 to 4 p. m. the wind averaged 20 miles per hour, and from 4 to 5 p. m. 27 miles per hour, with a maximum velocity at 4 p. m. of 43. It is, however, indicated that there was an extreme velocity at 4:01 of 52 miles per hour. That is explained as indicating temporary gusts of wind. I note that the record states that at 3:40 p. m. hail was reported in many parts of the city. The Weather Bureau also maintains a station at the Charleston Municipal Airport, which is situate some 10 miles north of the city. Naturally the primary purpose of that station is to give information in relation to the use and direction of aircraft. Several observers from that station testified, and their testimony generally was that there was little in the way of warning to forecast a heavy wind, and suddenly a gust came up which blew in windows of the observation tower. The witnesses testified to the wind blowing at a terrific rate. However, the Weather Bureau does not indicate that the storm was of such serious dimensions. The velocities were given from shortly after midday up to 15:48 (3:48 p. m.) at 20-plus miles per hour; it is shown that the wind was from the northwest and that at 3:53 the velocity is shown at 50-plus, at 4 o'clock dropping to 40-plus. There is a note on the chart stating that "Wind of 60 mph was observed." One of the witnesses also testified that a report had been received from an airplane that bad weather conditions had been observed.

The plaintiffs produced about 20 witnesses who testified as to their observation of the weather on the Sunday afternoon in question. These included people of various classes and walks of life. Some of them were citizens in the city who were out for the afternoon, some were parties in the country who were coming to the city via the Cooper River Bridge, and some who were in the city and planning to cross the bridge, and a few of them actually had crossed the bridge just before the accident. Their testimony is of varying value. Some merely testified that the weather looked bad, that there were black clouds to the north and west and they expected rain and wind; but others apparently made very

careful observations and commented on the possible danger as to whether they should go out in the dangerous looking weather, and some of these actually came up to the bridge with intent to cross and saw the accident. There were also persons employed at the toll gate at the bridge. From the testimony of these witnesses I am convinced that the weather was extremely threatening and dangerous. Of course no one can tell what amount of rain or wind is coming when glowering black clouds are seen. It is a familiar fact in this part of the world that storms of short duration but of high wind velocity are not infrequent. Commonly referred to as squalls or blows, they are difficult to forecast and frequently are of local origin and nature. Of course the presence of omnious-looking black clouds does not always mean a heavy storm or windstorm, but it may. Some of these witnesses testified that from their observations of the weather, they had doubt as to the safety of crossing this highway over the river or driving onto it. Several of them testified that the incidence of the storm and the collision with the bridge was not a matter of just a few minutes as testified to by the men in charge of the ship, but that ample time elapsed, as claimed by the plaintiffs, for an alert, active, competent, careful, prudent commander and crew to have put the ship in a position to combat the weather. One of these witnesses (Mr. Rivers) testified to driving in his automobile from Sullivan's Island with the intent of crossing the bridge and that the wind and rain came up with such violence that he parked his car under a large tree and waited approximately 10 minutes before proceeding on. He testified that before this heavy rain fell the clouds had been dangerous looking and he apprehended a storm was coming and hurried for that reason and after he waited by the roadside, he started his car again and drove up to the bridge, arriving just as the ship crashed into it.

We should again give due consideration to all of the testimony as to the condition of the ship. The ship had unloaded; it was getting ready to go into dock and it was more convenient to anchor above the bridge than into a safer anchorage place (see testimony of Captain Lockwood as to the safer anchorage place known as Rebellion Roads); a skeleton crew was aboard ship since they were not leaving port for a while and it was not necessary to have a full crew. Most of the members of this crew were new to and knew very little about the vessel. The Captain went ashore. The First Mate was not on duty and was in his room. The engine room crew were not alerted to their stations. No deck watch or engine room watch appears to have been set, and the only man who says he was really on duty was the Night Mate Wurthmann, who was not a regular member or officer of the crew and who had been on duty, according to his own testimony, continuously and without sleep or relief for 47 hours. I cannot believe that this indicates care or prudence in the management of a ship. The place where the ship was anchored, above a bridge crossing the river, with a wind blowing towards the bridge and a tide ebbing towards the bridge, with a ship that was light and a high exposed freeboard, all of these factors should put a cautious commander on notice that he was in a position where due care should be observed. There was ample warning that some weather disturbance might be expected. It is probable that if the regular officers had been in charge and on duty they would have issued orders to the crew to drop an additional anchor or at least have placed men to stand by to drop the anchor and have the engine room alerted. This was not done. The Boatswain testified that he was on the forward deck and when the storm first struck the vessel. he stood by the winch in order to be available to let go the anchor if orders were issued. But none came, and it was only after he began to walk aft that he met the Chief Officer coming forward and these two caused the anchor to be dropped. It will be noted that the Boatswain never received any orders from the man in command of the vessel. It will be noted that the man in command never gave any orders to anybody, but merely reported to the Chief Officer, who was not on duty and was in his room, that he thought they had better drop the second anchor. The

conduct of this officer in being the only man on duty to watch the bearings and check the weather and his actions in first looking at his watch to verify the time when the storm struck and then reporting to the Chief Officer, would indicate that he was acting more as a watchman than as a commander, yet he and he alone was in command.

Giving due consideration to all of the differences and discrepancies in the testimony, considering the interests, considering the status of the different witnesses and their business, motives, interests, and disinterests, I am constrained to believe that while there were no direct reports of a large storm brewing or approaching, there were very many indications that rain and wind probably of a temporary and perhaps of a serious character were to be expected. Many careful observers expected bad weather. A number of experienced waterfront men so testified, particularly the pilot Captain Igoe, Captain Webb, a retired merchant Marine Commander, Mr. Hutson, familiar with the waterfront, Mr. Pringle, an ex-airplane pilot, and many others. They of course did not know that a serious storm would hit the locality but they were prudent enough, in view of the weather that they saw, to feel that there was a strong probability, and danger, of a bad storm.

And if those in charge of the Nicaragua Victory had had the same prudent foresight and had exercised ordinary prudence, this catastrophe would never have happened. Of course indications of an approaching storm are not always realized. It was noted in passing that the log of this very ship showed that in a subsequent month while she was in Baltimore Harbor the crew had dropped a second anchor more than once, apprehending bad weather, and Captain Rosenquist, who incidentally stayed aboard his ship while in Baltimore Harbor, said that this was because they had some young officers. It seems to me that the young officers were more careful of the ship than the older officers who apparently thought it was too much trouble to alert the deck crew, alert the engine room, and drop a second anchor, or at least be prepared to do so.

■ Certainly there was no fault or negligence or criticism of those in charge of the bridge. The bridge had been there a long time. It was well and substantially built. It could be seen by anyone and those in charge of a movable object, such as a ship, must know that under all circumstances grave care should be taken in the handling of a ship anchored to windward and in an ebb tide of a structure of this character. Where a drifting ship collides with an object which is in no way at fault, the ship must show affirmatively that this drifting was the result of inevitable accident which human skill and precaution could not have prevented. The Louisiana 3 Wall. 164, 70 U.S. 164, 18 L.Ed. 85; The Newa, 4 Cir., 267 F. 115.

■ I am of the opinion that the collision could and should have been avoided by the exercise of proper care and prudence, and that any one or more acts on behalf of those in charge of the vessel might have averted the collision. It is of course impossible to say what one act caused the ship to drift from her moorings. But many acts can be pointed out which might have averted it. And I find that the ship and its operators were negligent in failing to observe and obey clear warnings of bad weather; in failing to put the ship in charge of a competent, careful officer; in putting the ship in charge of an officer who had been on duty an excessive period without relief or sleep; in failing to have any member of the crew on deck as a watch in addition to this watchman; in failing to alert the deck crew; in failing to alert the engine crew; in failing to be ready to drop the second anchor; in failing to drop the second anchor; in failing to have the engines ready for use; and in failing to use the engines. I am of the opinion that all of these matters contributed and that any one or more of them may have been the cause of the collision. And I hold that the plaintiffs have made proof of negligence and that the defendant is liable for the acts of its agents and employees who were acting within the scope of their employment.

The bridge was owned and operated by the South Carolina State Highway Depart-

ment which charged toll for its use, a toll gate and collection booth being maintained on the Christ Church Parish side of the bridge. As a result of the collision, no traffic could pass over the bridge, and the engineers of the Highway Department were immediately called in, made surveys, steps were taken to remove the fallen structure, and the ship was taken out and plans made and contracts let to rebuild the destroyed portions. The work consisted mostly of replacing the steel frame, together with the repairing and replacing of certain of the concrete sub-structure. The Highway Department obtained a temporary structure known as a "Bailey Bridge", and after the work had progressed a certain distance, this Bailey Bridge was put in place, which allowed a limited amount of traffic to pass over the bridge. When the permanent bridge was restored, the Bailey Bridge was removed and full traffic again resumed. The period of complete non-use of the bridge was from February 24, 1946, to April 4, 1946. The Bailey Bridge was in use from April 4, 1946, to June 6, 1946, and the bridge was opened to unrestricted traffic again on June 7, 1946.

The claim of the plaintiffs is two-fold: first, for the cost of restoring the bridge, and second, for loss of toll.

The items making up the restoration cost as shown by the Highway Department, I consider fair and correct, and find it unnecessary to discuss them in detail and allow the amount testified to, which is $176,548.38.

The second item claimed by the plaintiffs is loss of revenue during the period when the bridge was out of commission, both totally and partially. The Highway Department and its insurance carriers discussed and worked out this matter from many angles and finally agreed upon a method of computing the claim. I think that the method adopted and testified to was fair and is as close an approximation to the actual loss as may be arrived at.

This loss in toll was computed by estimating what would have been the normal toll received during the period when the bridge was no longer open to unrestricted traffic, part of this period showing no traffic and part restricted use. These estimates were made by comparison with toll receipts in months before and after traffic was impeded. There was testimony showing the cost of making temporary repairs to support the Bailey Bridge and thus allow restricted traffic, and also as to the amount of toll actually collected during the restricted period. Deducting the net receipts from the amount which it is estimated would have been received through normal use, we arrive at the total figure of toll loss. The insurance companies made a settlement and have paid a portion of this, amounting to $90,601.27. The balance of estimated actual loss of toll, not covered by insurance and therefore claimed by the Highway Department, is $34,524.93. But to this must be added the claim for depreciation of the Bailey Bridge. This last was purchased for $15,000.00 and depreciated approximately 25%, according to substantial testimony, which was without contradiction, and (with the adjustment of some minor items) this depreciation is fixed at $3,491.80. This gives a total allowance to the Highway Department for loss of tolls of $38,016.73. So that I find and allow for loss of toll a total of $128,618.00, which must be apportioned $90,601.27 to the insurance companies as hereinafter set out, and $38,016.73 to the Highway Department.

Now, the above figures must be further analyzed and broken down so as to allocate the respective claims. It appears that the State Highway Department had effected two kinds of insurance. First, property damage insurance, and second, use and occupancy insurance furnishing protection for loss of toll in just such an emergency as occurred. It was shown that the various plaintiff insurance companies, which carried the policies, had paid the amounts called for by their respective policies and took receipts and subrogation agreements from the Highway Department. Neither the property insurance nor the toll insurance was sufficient to cover the total loss, and therefore the Highway Department is suing for the excess of damage above its insurance recovery, and the insurance companies for

the actual amounts paid by them. I find these amounts to be as follows:

| | | |
|---|---:|---:|
| South Carolina State Highway Department, | | |
| Property Damage | $79,509.68 | |
| Use and Occupancy Loss | 38,016.73 | $108,526.41 |
| | | |
| The Gibraltar Fire & Marine Insurance Company, | | |
| Property Damage | 26,509.68 | |
| Use and Occupancy Loss | 22,650.32 | 49,160.00 |
| | | |
| Piedmont Fire Insurance Company, | | |
| Property Damage | 26,509.68 | |
| Use and Occupancy Loss | 22,650.32 | 49,160.00 |
| | | |
| Sub-Total brought forward | | $206,846.41 |
| Sun Insurance Office, Ltd. of London, | | |
| Property Damage | $15,905.80 | |
| Use and Occupancy Loss | 13,590.19 | 29,495.99 |
| | | |
| Boston Insurance Company, | | |
| Property Damage | 26,509.67 | |
| Use and Occupancy Loss | 22,650.32 | 49,159.99 |
| | | |
| Western Assurance Company, | | |
| Property Damage | 10,603.87 | |
| Use and Occupancy Loss | 9,060.12 | 19,663.99 |
| | | |
| Total Loss | | $305,166.38 |

The foregoing amounts will therefore be allowed as judgments to the parties shown and against the defendant, The United States.

Appropriate findings of fact, conclusions of law, and an Order will be filed.