In the Matter of the Complaint of HERCULES CARRIERS, INC., for exoneration from or limitation of liability as owner of the M/V Summit Venture.

No. 80–563–Civ–T–GC.

United States District Court,
M.D. Florida,
Tampa Division.

Sept. 14, 1984.

Dewey R. Villareal and Carl Nelson, Tampa, Fla., for Hercules Carriers.

G. Morton Good, Miami, Fla., Richard Rumrell, Jacksonville, Fla., David G. Hanlon and Benjamin H. Hill, Tampa, Fla., for DOT.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, District Judge.

The above styled case was heard by the Court without a jury commencing on May 21, 1984, and ending on May 25, 1984. The evidence was concluded by one deposition on May 29, 1984, which was submitted to the Court for consideration. After having heard all of the evidence, examining the

exhibits, pleadings, stipulations, and Proposed Findings of Fact and Conclusions of Law submitted by all parties, the Court makes the following Findings and Fact and Conclusions of Law as to the damages sustained by the Department of Transportation, State of Florida, (hereinafter DOT) as a result of the collision of the M/V SUMMIT VENTURE with the Sunshine Skyway Bridge on May 9, 1980.

## FINDINGS OF FACT

1. At or about 0734 on May 9, 1980, the M/V SUMMIT VENTURE struck the Sunshine Skyway Bridge located at the entrance to Tampa Bay. On May 12, 1980, Hercules Carriers, Inc. (hereinafter Hercules) as owner of the M/V SUMMIT VENTURE, filed its complaint pursuant to 46 U.S.C. § 183, et seq. and Rule F, Supplemental Rules, for certain admiralty and maritime claims, praying in the alternative for either exoneration from or limitation of liability with respect to all claims for damages which might be asserted against the vessel and/or Hercules arising out of the collision. Numerous claims were also filed for wrongful death, personal injury and property damage, as well as counterclaims and cross-claims against various parties. Prior to this trial, some of the above claims were determined by the Court, namely:

(a) This Court denied Hercules' claim for exoneration from or limitation of liability, holding that Hercules is liable for all damages resulting from the collision of the M/V SUMMIT VENTURE with the Skyway Bridge.

(b) Upon completion of the limitation trial, the Court next elected to try all wrongful death and personal injury claims which now have all been resolved by trial or settlement.

The Court next set this matter down for trial. The trial included the following issues:

(a) The damages, if any, sustained by the DOT as a result of the M/V SUMMIT VENTURE striking the Skyway Bridge.

(b) Whether the DOT was negligent in designing and/or protecting and/or maintaining the bridge, and if so, whether such negligence was a contributing cause to the collision or to the damages sustained to the bridge.

The trial did not include, by stipulation of the parties with the consent of the Court, the following issues:

(a) Hercules' counterclaim for damages;

(b) Hercules' claim that the DOT was negligent in failing to provide proper aids to navigation;

(c) Hercules' claim that the State of Florida negligently hired and/or retained Pilot Lerro;

(d) Hercules' claim that the DOT should have had a device on the bridge to warn motorists in the event the bridge failed.

The above issues will be set for trial at a later date. At the conclusion of that trial, a judgment will then be issued with respect to the State's claim.

2. To the extent pertinent, the facts stipulated to by the parties and incorporated in this Court's Findings of Fact and Conclusions of Law dated March 14, 1983 (See 566 F.Supp. 962 (S.D.Ala.)) are reincorporated herein as if fully set forth.

3. The Sunshine Skyway Bridge is a twin bridge toll facility and carries U.S. Route 19 and Interstate Route 275 traffic over and across Tampa Bay. The entire bridge is approximately five miles in length with the remaining 10 miles made up of causeway and land highway.

4. The main ship channel is spanned by a bridge approximately 5,621 feet in length, with the main channel clearance being 800 feet and a minimum vertical clearance of 141.6 feet above the water.

5. The bridge consists of a three-span steel cantilever truss with a center span of 864 feet flanked by 360 foot anchor arms on either side for a total length of 1,584 feet. The cantilever truss spans are supported on four concrete piers designated as 1N and 2N on the Northside of the main channel and 1S and 2S on the Southside. The remainder of the bridge consisting of

two 289 foot 3 inch deck trusses, six 140 foot steel girder spans and six 100 foot steel girders were not involved in this collision. Exhibit A attached to these findings illustrates the relevant portions of the bridge.

6. The bridge is made up of a two lane northbound span and a two lane southbound span. These two spans are separated by a distance of approximately 100 feet. It was the southbound span that was struck by the M/V SUMMIT VENTURE. The northbound span was only slightly damaged.

7. On May 9, 1980, the bow of the M/V SUMMIT VENTURE collided with Pier 2S of the southbound span. The initial impact was between the flared bow of the ship and the west column of Pier 2S. Almost simultaneously the bulbous bow of the vessel hit the pedestal of Pier 2S. As a result, both east and west columns of Pier 2S collapsed and 1,261 feet of the superstructure fell into the bay below. This included the south anchor span from Pier 3S to Pier 2S, the south cantilever span, and the drop-in span, as indicated in Exhibit A.

8. Within seconds after the bulbous bow hit the pedestal, the vessel deflected to port causing it to scrape alongside Pier 2S.

9. The DOT elected to construct a new four lane span, rather than to rebuild the damaged southbound span.

10. The Court finds that any repairs if made to the portion of the bridge damaged by the M/V SUMMIT VENTURE would not extend the overall useful life of the bridge, nor would they enhance its value. The Court further finds that the repairs, if made, would put the bridge back to its pre-collision condition.

11. As a result of the collision, the Coast Guard ordered the DOT to immediately clear the channel in order to reopen the harbor to vessel traffic.

12. Because of the numerous and varied claims for damages, the Court will make special findings of fact for each element of damages claimed.

## BRIDGE REPAIR—PROPERTY DAMAGE

13. The Court finds that actual loss and damage sustained by the DOT to the superstructure of the southbound span as a result of the collision of May 9, 1980, was as follows:

(a) The entire span between 2S and 3S, the entirety of the anchor span between 2S and 1S, and a part of the southern portion of the cantilever structure extending from Pier 1N over the channel were destroyed and would have to be rebuilt in their entirety.

(b) The deck trusses and various members between Piers 3S and 4S were damaged and would have to be repaired or replaced.

(c) A portion of the bridge extending north from Pier 1N was damaged and would have to be replaced or repaired.

(d) All navigation and aerial lights plus the connecting conduits were destroyed and would have to be replaced.

14. The Court finds that the damage to the substructure of the southbound span as a result of the collision was as follows:

(a) Pier 1N: New cracks were found on the western portion of the top of the pier with both vertical and horizontal displacement. The necessary repairs would involve the installation of a concrete collar completely surrounding the pier cap to contain the cracks and re-establish the integrity of the pier. The Court finds the installation of this collar was necessary.

(b) Pier 1S: Old cracks in the pier shaft which existed before the collision were aggravated by the collision. New cracks were found in the upper East/West buttresses as well as the cracks on the lower buttresses caused by falling metalwork. The pier cap was found to have numerous new spalls and new cracks. The Court finds as a matter of fact, that to repair this damage, both shafts and the cap should be replaced.

(c) Pier 2S: The Court finds that Pier 2S took the brunt of the impact from the colli-

sion. This resulted in the complete destruction of the pier cap and both shafts. The Court is of the opinion that the supporting piles were moved as a result of the impact with the vessel. In support of the Court's position relating to the damage and the replacement of Pier 2S, the Court further finds as matters of fact, the following:

(1) The 114 pilings supporting the pier were made of prestressed concrete. If the pilings moved ½ inch or more, some or all of the pilings would fracture. Further, if this occurred, the entire pier and pilings would have to be replaced to ensure safe passage across the bridge. ·

(2) The physical evidence demonstrates that the bulbous bow area of the vessel struck the pedestal with considerable force. There was paint on the pedestal which matched the paint on the hull of the vessel. There were large impact areas on the bulbous bow and at midship which were at the same level as the pedestal.

(3) A survey of the alignment of all of the piers supporting the southbound span demonstrated that 2S was not in alignment with other piers and this lack of alignment was consistent in direction with the movement of the vessel.

(4) All experts at trial seemed to agree, and the Court so finds, that the remaining portion of the pier (bottom buttresses and pilings) could not be reused without establishing that piles had not fractured. In order to make that determination, substantial testing would have to take place. Both sides were in agreement that the cost of the tests, if a viable test exists, would exceed the cost of replacing the piles.

(d) Pier 3S: Minor new spalls were found on the pier cap, the pedestal and the foundation. These spalls had to be grouted.

15. There were minor spalls found on the west shaft of Pier 1S (northbound). These spalls also had to be grouted.

16. Minor spalls were found on the east shaft of Pier 2S (northbound). These spalls had to be grouted.

17. The Court's findings with regard to the damage to Pier 1S and 2S on the northbound bridge are supported by the evidence and testimony of the experts and are not contested by Hercules.

18. Mr. Chester Grimsley testified for the DOT as to the reasonable cost of repairing the physical damage to and replacing those parts which had to be replaced on, the southbound span. Mr. Grimsley estimated the cost of this repair was $13,-634,719.00. The Court adopts this figure as to the reasonable cost of repairing the southbound span. This estimate includes painting and replacing of many deteriorated missing parts. At the time of the collapse of the bridge, the DOT had contemplated doing this painting and replacing in the near future. The cost of the painting and replacing will be treated later in this finding.

19. The Court finds the reasonable cost of repairs to the piers of the northbound span (Pier 1S and Pier 2S) is $25,000.00. This figure is not contested by Hercules.

BRIDGE REPAIR—CONTINGENCIES

20. The Court is aware that in every large project, certain contingencies must be made for the unexpected. The repair of the Skyway Bridge is an example of such a project. The DOT offered evidence at trial of these contingencies based on its historical construction data. While some additional funds may be required for contingencies, the Court did not find particularly probative the DOT's statistically developed percentage, based on the average of all construction jobs, in connection with this extraordinary operation. The Court finds 5% to be a more reasonable figure and further finds that a reasonable amount for contingencies is $681,736.00.

BRIDGE REPAIR—ENGINEERING
AND INSPECTION OF
CONSTRUCTION

21. The DOT's historical construction data reflects that in every major construction project, the DOT experiences engineering and inspection costs of 10% of the construction contract. These costs reflect the

costs of engineers and inspectors either from the DOT or from outside consultants. The Court does not find the DOT's historical construction data probative. The Court is of the opinion that 6% of the construction contract or $858,987.00 would be a more reasonable amount with regard to this particular project.

## BRIDGE
## REPAIR—ADMINISTRATIVE COSTS

22. The Court finds that the DOT is not entitled to an award for administrative costs as to this phase of the work.

## DEBRIS
## REMOVAL—HARDAWAY CONTRACT

23. As a result of the collision, at least 1261 lineal feet of the steel superstructure and road bed, several vehicles including a bus, and portions of the damaged concrete piers were in the water. Much of this debris was in the only shipping channel in and out of Tampa Bay. The remainder of the debris was entangled around the remnants of the piers of the southbound bridge and was resting against two of the northbound piers. The Court finds that time was of the essence and that removal of the bridge debris required immediate resolution by the DOT.

24. To remove this debris and wreckage from the channel and the surrounding waters, DOT immediately following the collision entered into a contract with Hardaway Constructors, Inc. Hardaway, the contractor for the southbound bridge when it was constructed in the late 1960's, had a Tampa office and was readily available and able to perform this work.

25. The debris was first surveyed by engineers and divers. The survey revealed that much of the debris was large in size, entangled, and potentially unstable. For safety and economy the DOT's experts concluded that the debris should be cut to a safe, manageable and stable size, and then removed. For this operation, Hardaway had to use several barges, cranes and other construction apparatus. The Court finds that under the special circumstances presented here, the time required for debris removal, 78 days, and the amount paid by the DOT to Hardaway, $3,238,599.00, was necessary and reasonable.

## DEBRIS
## REMOVAL—MELBOURNE BROS.

26. After the collision, four sections of the cantilever arm of the superstructure were left extending 252 feet over the main shipping channel southward from Pier IN. Because of the possibility that this protruding metal work may break loose and strike the northbound span or create further problems for vessels passing through the main channel, the DOT removed 180 feet of the protruding section. The DOT contracted with Melbourne Bros. to perform this work. Melbourne Bros. charged the DOT and the DOT paid $231,507.00, which the Court finds reasonable.

## DEBRIS REMOVAL—ENGINEERING
## AND INSPECTION OF
## CONSTRUCTION

27. The Court is of the opinion that the debris and metal removal work performed by Hardaway and Melbourne Bros. required very little, if any, supervision and inspection by the DOT personnel. The Court feels that supervision and inspection of the debris removal by the DOT was included in the original contracts between the DOT, Hardaway and Melbourne Bros. The Court feels that any award for supervision and inspection by the DOT would result in double recovery to the DOT.

## DEBRIS
## REMOVAL—ADMINISTRATION

28. The Court finds that the DOT is entitled to 1% of the Hardaway and Melbourne Bros. contracts combined for administration of the debris removal. The Court further finds that amount to be $34,-701.00.

## MAINTENANCE OF TRAFFIC—MIKE
## HUNTER, INC. & JOHN
## DANIELS PAVING

29. Since shortly after the accident, southbound traffic has been routed over

the remaining original span, which had been carrying only northbound traffic.

30. The DOT contracted with Mike Hunter, Inc. and John Daniels Paving to place signs, barricades, and to pave the detour to re-route the bridge traffic from the southbound bridge to the northbound bridge following the collision. All parties agreed that the work performed, the charges rendered, and the amount paid by the DOT to Mike Hunter, Inc. and John Daniels Paving were necessary and reasonable. The Court, therefore, finds that the amount paid, $174,496.00, was reasonable.

## MAINTENANCE OF TRAFFIC—ENGINEERING AND INSPECTION

31. The Court finds 6% of the Mike Hunter, Inc. and John Daniels Paving contracts combined to be a reasonable figure for any engineering and inspection by the DOT relating to the maintenance of traffic. The Court further finds 6% of those contracts to be $10,470.00.

## MAINTENANCE OF TRAFFIC—ADMINISTRATION

32. The Court finds 3% of the Mike Hunter, Inc. and John Daniels Paving contracts to be a reasonable award for any administrative costs incurred by the DOT in the maintenance of traffic after the collision. The Court finds this amount to be $5,235.00.

## MAINTENANCE OF TRAFFIC—STATE FORCE

33. According to the testimony, immediately after the collision the DOT worked its personnel around the clock to establish a detour for bridge traffic. They erected the signs supplied by Mike Hunt, Inc., established proper lighting, and set up the barricades. Once this emergency work was completed, the DOT was required to maintain the detour, including constant replacement of signs, lighting, barricades, and the like. The Court finds the reasonable costs of this work by the DOT over the 27 months required to repair and rebuild the bridge was $138,900.00.

## LOSS OF TOLL REVENUE

34. As a result of the collision, the revenue from the southbound toll bridge was substantially affected. To determine the Dot's loss of toll revenue for the 27 month period required to repair and rebuild the bridge, the Court has considered the actual history of earnings for the bridge prior to the collision, the actual traffic flow before the collision, the DOT's experience with other toll facilities before and after the collision, the actual experience with the Sunshine Skyway toll revenue and traffic following the collision, projection of losses of revenue based upon these data, and studies that determined the reasons why persons used the bridge. The Court finds that the data, projections, and studies relied upon by the DOT reasonably and accurately reflect its loss of toll revenues. The Court, therefore, finds that the loss of toll revenue proximately caused by the collision was $758,119.00.

## PRELIMINARY ENGINEERING

35. As a result of the collision, the DOT was required to evaluate the extent and nature of damage to the bridge. For these purposes the DOT retained Howard, Needles, Tammen and Bergendoff; Byrd, Tallamy, McDonald and Lewis; and Heidt and Associates. From these studies, the DOT compiled the data necessary to solicit bids to repair and rebuild the bridge. The DOT paid Howard, Needles, Tammen and Bergendoff, $329,000 for its work in evaluating the damage to the piers. The DOT likewise paid Byrd, Tallamy, McDonald and Lewis, $100,000 for its work in evaluating the damage to the bridge and providing a cost estimate for repair and replacement. Heidt and Associates was paid $30,000 to perform survey work to determine the alignment of the piers. The Court finds these costs reasonable and awards the DOT $459,000 for preliminary engineering expenses.

## DESIGN, PIER PROTECTION AND MAINTENANCE

36. Hercules offered testimony at trial regarding the design, pier protection and maintenance of the southbound span of the Skyway Bridge. The gist of Hercules' testimony was that the design of the bridge was improper; the absence of pier protection caused the bridge to collapse upon collision; and that the DOT failed to properly maintain the bridge and this improper maintenance either caused or substantially contributed to the ensuing damages.

37. The Court finds that the design and construction of the cantilever southbound span was reasonable for its intended purposes of accommodating both vehicular traffic and waterborne traffic. The Court also finds that the location of the southbound bridge did not create an unreasonable obstruction to navigation. Hercules failed to present any evidence that the design of the bridge contributed to the collision or to the extent of damages. The Court therefore finds that the design of the southbound bridge was reasonable and did not cause or increase the damages to the pier.

38. Pier 2S was one of the 30 non-channel piers. It was located 800 feet from the center line of the channel. The Court finds the DOT was reasonable in not providing pier protection for Pier 2S (southbound) and the other 29 non-channel piers.

39. The Skyway Bridge requires maintenance as do all bridges spanning salt water in Florida. According to the evidence, the Sunshine Skyway Bridge was in need of several repairs prior to the collision of May 9, 1980. Reports of regularly scheduled inspections performed by or on behalf of the State indicated that major repairs in the form of repainting of the steel superstructure, correction of corrosion, and replacement of missing bolts in the steel structure were needed. The Court finds that the above maintenance would have been forthcoming but for the collision. Hercules' expert testified that $1,100,000 would have been required to complete the repainting of and repair work

necessary to preserve and maintain that part of the bridge damaged in the accident. The DOT expert testified that $736,000 would have been required to perform the same work. The Court finds the testimony of each expert to be persuasive, but finds the figure of $1,000,000 as reasonable for such repairs.

40. The Court also finds that neither the state of disrepair nor the lack of proper maintenance caused or contributed to the resulting damage to the bridge. Expert witnesses on both sides testified that the damage to the bridge would have been the same if the collision had occurred the day after the span had been constructed. The Court finds absolutely no causal connection between the maintenance and the collision or the resulting collision damages.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter, in admiralty, and over all the parties and their claims, pursuant to 28 U.S.C. § 1333 and 46 U.S.C. § 185 (1976).

2. The Court has made detailed findings concerning the accident, the collapse of the bridge, and the damages suffered by the State of Florida as a result of the accident of May 9, 1980. To the extent that these findings also constitute legal conclusions, they are incorporated herein.

3. The damage issues are decided under federal law rather than state law because the cause of action arises under general maritime law. *Freeport Sulphur v. The S/S Hermosa*, 526 F.2d 300, 1977 AMC 508 (5th Cir.1976).

4. The legal measure of damages for rebuilding and repairing the Sunshine Skyway Bridge, to which the parties have agreed, is the cost of restoring the bridge to its condition immediately prior to the collision of May 9, 1980. *Barger v. Hanson*, 426 F.2d 640 (9th Cir.1970); McCormick, *Damages*, 560 (1935). The DOT is also entitled to recover consequential damages including loss of toll revenue, cost of constructing and maintaining the detour, and the cost of debris removal.

Expenses which naturally and reasonably follow from an injury to property are proper items of recovery. *South Carolina State Highway Department v. United States,* 78 F.Supp. 598 (E.D.S.C.1948), aff'd 171 F.2d 893 (4th Cir.1948); *U.S. v. State Road Department of Florida,* 189 F.2d 591 (5th Cir.1951).

█ 5. The Sunshine Skyway Bridge was not repaired or rebuilt because the DOT decided to build a new four-lane structure rather than repair the old bridge. Even though actual repairs were not made, the Court concludes as a matter of law, that the DOT is entitled to compensation for its damages based upon estimated repair costs. *Bleakley Transport Co. v. Colonial Sand & Stone Co.,* 245 F.2d 576 (2d Cir.1957).

6. Based on the foregoing findings of fact, the Court now enumerates the following damages:

### REPAIRS TO THE NORTHBOUND SPAN

The Court finds that the DOT is entitled to $25,000 to repair damage to the north span.

### REPAIRS TO THE SOUTHBOUND SPAN

The State is entitled to recover for repair of the bridge as follows:

| | |
|---|---|
| 1. Repair of the bridge | $13,634,719.00 |
| 2. Contingencies—5% | 681,736.00 |
| 3. Engineering and Inspection of Construction—6% | 858,987.00 |
| TOTAL BRIDGE REPAIR | $15,175,442.00 |

### DEBRIS REMOVAL

The State is entitled to recover the following for debris removal:

| | |
|---|---|
| 1. Paid to Hardaway Constructors, Inc. | $3,238,599.00 |
| 2. Paid to Melbourne Bros. | 231,507.00 |
| 3. Administrative costs. | 34,701.00 |
| TOTAL DEBRIS REMOVAL | $3,504,807.00 |

1. See Findings of Fact Nos. 30, 31, 32.

### MAINTENANCE OF TRAFFIC

The Court concludes that the State is entitled to recover $190,201.00 [1] for maintenance of traffic and detour.

The Court further concludes that the State is entitled to recover $138,900.00 [2] for work done by the DOT in maintaining the detour over the 27 months required to repair and rebuild the bridge.

### LOSS OF TOLL REVENUE

The Court has found the evidence relating to the loss of toll revenue credible. The Court, therefore finds that the State is entitled to recover $758,119.00 for loss of toll revenue.

### PRELIMINARY ENGINEERING

The Court found as a matter of fact that several outside engineering firms were retained by the State shortly after the disaster in an effort to assess the damage to the Skyway Bridge. The Court found that the only evidence of actual expense associated with preliminary engineering were the amounts paid to Howard, Needles, Tammen and Bergendoff, $329,000; Byrd, Tallmy, McDonald and Lewis, $100,000; and Heidt and Associates, $30,000. The State offered no evidence as to the actual expenses incurred by the State for preliminary engineering. Therefore, the Court finds that the State is entitled to $459,000.00 for preliminary engineering to cover amounts already paid.

### PIER PROTECTION, DESIGN AND MAINTENANCE

The Court finds that the DOT was not negligent in failing to provide pier protection.

The Court further finds that the bridge was properly designed. The bridge was fit for its intended purpose, that is, to transport vehicular traffic across Tampa Bay while at the same time accommodating waterborne traffic beneath it. The Court also

2. See Finding of Fact No. 33.

**24**

concludes that it was not a legal obstruction to navigation having been built pursuant to all applicable rules and regulations promulgated by the Corps of Engineers and other interested agencies.

The Court has found that the maintenance of the bridge or lack thereof, did not cause or contribute to the damage sustained by the State when the bridge fell after collision. The Court also found that the State was entitled to recover only the value of the bridge immediately prior to the accident. The Court finds that $1,000,-000.00 would have been required to perform the necessary repair and maintenance work to that part of the span which was damaged in the accident and further concludes that the damages recoverable by the State for the cost to repair the bridge shall be reduced by that amount.

### PREJUDGMENT INTEREST

■ 7. Prejudgment interest should be awarded in admiralty cases not as a penalty, but as a compensation for the use of funds to which the claimant was entitled. *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980). An award of prejudgment interest "... although within the Court's sound discretion, is well-nigh automatic in suits in the admiralty." *Masters v. Transworld Drilling Co.*, 688 F.2d 1013, 1014 (5th Cir. 1982). To deny prejudgment interest the Court must find circumstances that would make it inequitable for the losing party to pay prejudgment interest. *Inland Oil and Transport Co. v. Ark White Towing Co.*, 696 F.2d 321 (5th Cir.1983).

■ The Court concludes that the DOT is entitled to prejudgment interest at the rate of 9.98% per annum from May 9, 1980, on the following items:

| | |
|---|---|
| Hardaway Contractors | $3,238.599.00 |
| Melbourne Bros. | 231,507.00 |
| Debris Removal | 34,701.00 |
| Mike Hunter, Inc. | 78,017.00 |
| John Daniels Paving | 96,479.00 |
| Howard, Needles, Tammen & Bergendoff | 329,000.00 |
| Byrd, Tallamy, McDonald & Lewis | 100,000.00 |
| Heidt and Associates | 30,000.00 |
| Maintenance Work on Detour | 138,900.00 |
| Maintenance | 15,705.00 |
| Loss of Toll Revenue | 758,119.00 |
| TOTAL | $5,051,027.00 |

In making this finding, the Court is not ruling out the possibility that there are other items for which the DOT should be paid prejudgment interest. Ruling on these other items is reserved until final judgment is entered in this case.

### CONCLUSION

8. The Court finds and concludes that the State of Florida is entitled to damages in the amount of $20,251,469.00 as a result of the collision of May 9, 1980. The above sum is to be offset by $1,000,000.00, a sum the DOT would have been required but for this accident to have expended on the maintenance of the collapsed structure.

A final judgment consistent with these findings of fact and conclusions of law shall be entered after trial on the remaining issues of the counterclaim by Hercules.