COAL OPERATORS CASUALTY CO. v. UNITED STATES et al.

No. 175 of 1945.

District Court, E. D. Pennsylvania.

Aug. 14, 1947.

J. Webster Jones, of Philadelphia, Pa., for plaintiff.

Conlen, LaBrum & Beechwood, of Philadelphia, Pa., for respondents.

KIRKPATRICK, District Judge.

Nehemiah Williams, an employee of South Philadelphia Boiler Cleaning Company, an independent subcontractor, was injured while engaged in painting the steamship American Fisher. This suit in Admiralty was brought by his employer's compensation insurance carrier against the respondents as owners, asserting third party liability for negligence causing or contributing to the injury.

### Findings of Fact.

1. On October 12, 1944, Williams, one of four men of the Boiler Company working on a float alongside the American Fisher, then undergoing repairs in the port of Philadelphia, was engaged in spraying the hull with paint. Several other employees of the Boiler Company were on the deck of the ship and, under the direction of the foreman, were handling the lines by which the float was moved along the side as the painting progressed. In the course of the work, the float had been moved by progressive stages toward the stern of the vessel until it reached a point where part of it at least was directly underneath the overboard discharge orifice of the salt water circulating system of the ship. It remained there for about seven minutes while the foreman refilled the paint pot, which was on deck. During this time no water was coming from the discharge. Williams had just resumed spraying the hull and had painted around the discharge when a stream of scalding hot water and steam was discharged with great force from the hole, injuring him severely. The accident occurred at 11:25 A. M.

2. The discharge of hot water was caused by the temporary clogging of the intake of the circulating system by floating debris.

Comment: Two other theories as to the cause of the discharge of hot water and steam were advanced by the libellant; but accepting (as I do) the testimony of the three engineer officers who were on duty in

the engine room as true, the only conclusion that can be reached is that it was physically impossible for the discharge to have been due to any cause other than that stated in the finding. It could not have been caused by some person's opening a valve because there was no valve anywhere on the ship by which live steam could have been admitted to the salt water circulating system. It was not caused by a temporary shutting down of the circulating pump, because the uncontradicted testimony is that the pump operated throughout the day of the accident without any interruption. The libellant's principal expert agreed that the clogging of the intake could have produced a discharge of abnormally hot water. What occurred was that, with the suction blocked, although the pump continued to operate normally, the water in the condenser tubes ceased to circulate and became greatly overheated from the steam in the condenser. When the obstruction was removed and the water started to circulate, this mass of hot water was ejected from the discharge, accompanied by clouds of steam. The respondent produced expert testimony in support of this view, but, apart from that, elimination of all possible causes except one, so that the proof by remaining cause is the only one which could have produced the event is logically sound and in accordance with the principles of judicial proof.

3. Clogging of the intake is an unusual occurrence, but when a ship is in a harbor where the water is full of debris, as it was in this case, it is not so extraordinary that it is not to be anticipated by experienced ship's officers.

4. The temporary stoppage of circulation of water in the condenser was not due to any defect or deficiency in the circulating system.

5. A short time before the accident a deck officer asked Ambruso, the painter foreman on the deck, how soon he expected to have the paint job finished. Ambruso replied that he had only three more "moves" to make and that he would be finished by noon. The two men looked over the side of the ship and could see that the float was ready to be moved and that in the course of its progress toward the

stern it would have to come opposite the overboard discharge. Ambruso knew which of the openings on the ship side was the overboard discharge. There was no further communication between him and the ship's officers until the accident happened.

Comment: "A short time" should perhaps be stated more precisely, and I will try to do so, but it is not easy to say exactly how long before the accident this conversation took place. Assuming that Williams fixed the time for the accident (11:25 A. M.) correctly, it is hardly possible that the time which Ambruso gave for the conversation, 10:30 A. M., can also be right. Ambruso said, "I says I would be done before dinner time * * * and then the accident happened." He also said that he talked to the officer "just before the accident." Williams testified that "We were ready to leave the flat side of the ship. We got almost to the stern, where the ship would curve in, going down toward the propeller, like" at the time of the accident, and that they were about halfway down the off-side of the vessel. Inasmuch as it would require three moves to finish the painting, this would indicate that it was during the first stop which the float made after the officer spoke to Ambruso that the accident occurred. The float had been stationary at the point of the accident for about seven minutes. Consequently it would seem that Ambruso's conversation with the deck officer could hardly have been more than 15 or 20 minutes before the accident.

6. The deck officer to whom Ambruso spoke should have been aware of the danger to men working under the overboard discharge of his ship, and knowing that the work to be done would necessitate the float being soon placed in the immediate vicinity of the overboard discharge, reasonable care required him to take steps to cut off or stop the operation of the circulating system while the work was being done.

Comment: It is a fact that it is customary, when a ship is being painted, for the painter foreman to notify some responsible officer of the ship when the job reaches a point requiring the men to be near the overboard discharge or other dangerous

points on the ship's hull, work being suspended while the circulating system is temporarily shut down. In view of what he told the deck officer and what the deck officer saw, Ambruso may or may not have expected that the pump would be cut off. His testimony as to what the custom was is not accepted, so far as it conflicts with the unequivocal testimony of the three contractors called by the respondent. Whether or not Ambruso was negligent is immaterial if any negligence on the part of the ship's officers directly caused or contributed to the injury. The deck officer must have known that the progress of the work would bring the men under the discharge pipe within a very short time, and whatever the custom, he was not justified in such circumstances in waiting for some further notification from Ambruso. He could have done one of two things: either he could have notified the engine room to cut off the circulating pump, or if conditions were such that interruption would have caused serious inconvenience, he could have directed Ambruso not to move the float until the operation of the pump could be conveniently suspended. While, under ordinary conditions, work in the neighborhood of a ship's overboard discharge may be safe enough, it can, and on occasion does, become dangerous in the highest degree, and this possibility placed a correspondingly high duty of care on those in control of the vessel and the work being done on it. Both the painter foreman and the deck officer failed to conform to the standard of conduct of a reasonably careful man under the circumstances.

7. Williams did not know which of the openings in the side of the ship was the overboard discharge from the engine room and did not know that he was placing himself in a dangerous position at the time of the accident.

Comment: For at least seven minutes no water had been coming out of the discharge pipe. Undoubtedly water had been coming from it earlier, but the exact time when the flow stopped or whether it stopped suddenly or merely dwindled away does not

appear, and it is to be remembered that Williams had been occupied in painting the portion of the hull immediately in front of him as the float was moved along. There is no reason not to accept his statement that he did not see any water coming from the side of the ship that morning.

### Conclusions of Law.

1. This Court has jurisdiction.

2. The libellant is entitled to maintain this action.*

3. The respondent's deck officer was negligent.

4. Williams was not guilty of contributory negligence.

5. The libellant is entitled to a decree.

### Discussion.

■ The Suits in Admiralty Act gives general jurisdiction of the cause of action in this case. There can be no doubt that the libellant insurance carrier could maintain this libel if the ship were privately owned. In the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., the government has given its consent to be sued in cases in which a proceeding in admiralty could be maintained if the vessel were privately owned or operated. The presence of the vessel in territorial waters of the United States at the time of the beginning of the suit is not necessary, since circumstances of the injury permit either an action in rem or an action in personam. The case is not one in which, as in Blamberg Bros. v. United States, 260 U.S. 452, 43 S.Ct. 179, 67 L.Ed. 346, there was no element of personal fault for which an action in personam could have been maintained. See Grant v. United States War Shipping Administration, D.C., 65 F.Supp. 507. The question of venue jurisdiction is not raised and could not be in view of the residence of the parties.

■■ The libellant does not need the doctrine res ipsa loquitur to support its case and the disputed question whether, in view of the large number of the Pioneer Engineering Company employees on the ship, that doctrine applies, need not be con-

---

* The allegations contained in paragraphs 2, 4, 5, 6, 15, 16 and 17 of the libel have been either admitted or proved by undisputed testimony. They are here adopted as findings of fact and support the above conclusions of law.

240

sidered. Res ipsa loquitur permits a finding of negligence in the absence of proof of all the facts which would be necessary to support it, were the case an ordinary one. Where all the circumstances of the accident are fully proved and are before the Court, as in the present case, it is not necessary to resort to "the inference of negligence permissible from a defendant's exclusive control of the instrumentality which inflicts the injury", Sierocinski v. E. I. Du Pont, De Nemours & Co., 3 Cir., 118 F.2d 531, 535.

■■ A written statement of the circumstances of the accident signed by Nehemiah Williams was not offered by the respondent in view of the Court's ruling that the entire statement must be in evidence before examination on parts of it could proceed. This ruling was clearly correct. However, it may be said that there is nothing in the statement which would cause the Court to make any findings different from those which have been made. The statement of the witness Mehmet was not offered in evidence and was clearly incompetent in view of the fact that he could not read English and depended on what was told him for his knowledge of what was in it.

A decree will be entered in favor of the libellant.