UNITED STATES v. SOUTH CAROLINA STATE HIGHWAY DEPARTMENT et al.

No. 5808.

United States Court of Appeals Fourth Circuit.

Dec. 29, 1948.

Harold A. Mouzon, of Charleston, S. C., and Leavenworth Colby, Sp. Asst. to Atty. Gen. (Ben Scott Whaley, U. S. Atty. and B. Allston Moore, both of Charleston, S.C., and Robert S. Erskine and John F. Gerity, both of New York City, on the brief), for appellant.

Huger Sinkler and Augustine T. Smythe, both of Charleston, S. C., John M. Aherne, of New York City, Augustine T. Smythe, Jr., of Charleston, S. C., and Fred B. Helms, of Charlotte, N. C. (John M. Daniel, Atty. Gen. of South Carolina, Helms & Mulliss, of Charlotte, N. C., and Bigham, Englar, Jones & Houston, of New York City, on the brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is an appeal by the United States from an adverse judgment in an action brought under the Federal Tort Claims Act, 28 U.S.C.A. § 921 et seq.,[1] to recover the damages sustained when the government owned vessel, Nicaragua Victory, crashed into the Grace Memorial Bridge over Cooper River at Charleston, S. C. The action was brought by the South Carolina State Highway Department in behalf of itself, as owner of the bridge, and various insurance companies, from which it had collected insurance on account of the damage. The insurance companies were joined as parties plaintiff; and, upon a finding that the damage amounted to $305,166.38, judgment was entered in their behalf for $196,639.97, being the amount that they had paid by way of insurance, and in behalf of the South Carolina Highway Department for $108,526.41.

There is little dispute as to the amount of the damages and what there is has so little merit as not to warrant discussion. The appeal presents two questions for our consideration: (1) Whether the damage to the bridge was due to fault in the operation of the vessel, and (2) whether the insurance companies may recover in this case as subrogees. Both questions, we think, should be answered in the affirmative. The facts of the case are fully set forth, with an adequate analysis of the evidence, in the careful and comprehensive opinion of the District Judge. See South Carolina State Highway Department v. United States, D. C., 78 F.Supp. 598. They need not be repeated here but may be briefly summarized as follows:

The Nicaragua Victory arrived in Charleston Harbor on February 7, 1946, and after completing the discharge of her cargo was preparing to go into dry dock for an overhaul. On Sunday morning, February 24, she was anchored in the Cooper River below the bridge when she was struck by another vessel that had dragged its anchor. It was then decided to change the anchorage, and she was taken about half a mile above the bridge and anchored to her port anchor in the eastern branch of the Cooper River about three o'clock in the afternoon. Notwithstanding that the weather was threatening, that a twenty mile an hour wind was blowing toward the bridge and that a strong ebb tide was flowing in that direction, the master left her at this anchorage around 3:20 in the afternoon with no adequate crew to take care of her in case of trouble and in charge of a night mate who had then been on duty continuously for more than forty hours. Shortly before four o'clock the weather became a great deal worse, the wind increased to a gale of sixty miles an hour or more and the vessel dragged anchor and drifted towards the bridge. Although the danger of colli-

---

[1] 1948 Judicial Code, 28 U.S.C.A. §§ 1291, 1346, 1402, 1504, 2110, 2401, 2402, 2411, 2412, 2671–2680.

sion was imminent, nothing was done to avert it except that the starboard anchor was dropped just before the crash came, when it was too late to accomplish anything. Had a competent officer been aboard and on the lookout with the crew alerted, the collision could, in all probability, have been averted. If not, it was negligence to anchor the vessel so near the bridge with such conditions of wind and tide prevailing. As was well said by the District Judge [78 F.Supp. 607]:

"I am of the opinion that the collision could and should have been avoided by the exercise of proper care and prudence, and that any one or more acts on behalf of those in charge of the vessel might have averted the collision. It is of course impossible to say what one act caused the ship to drift from her moorings. But many acts can be pointed out which might have averted it. And I find that the ship and its operators were negligent in failing to observe and obey clear warnings of bad weather; in failing to put the ship in charge of a competent, careful officer; in putting the ship in charge of an officer who had been on duty an excessive period without relief or sleep; in failing to have any member of the crew on deck as a watch in addition to this watchman; in failing to alert the deck crew; in failing to alert the engine crew; in failing to be ready to drop the second anchor; in failing to drop the second anchor; in failing to have the engines ready for use; and in failing to use the engines. I am of the opinion that all of these matters contributed and that any one or more of them may have been the cause of the collision."

The contention of the government is that when the master left the vessel the weather was fine, with no indication of trouble to come, and that the collision with the bridge was the result of unforeseen and unforeseeable weather condition against which no amount of precaution would have availed; and the government offered considerable evidence to support this contention. On the other hand there was abundant proof on the part of the plaintiffs that, at that time, the weather was bad and getting worse and that, in the exercise of due care, provision should have been made to guard against just what happened. The District Judge reviewed all of this evidence and stated his conclusion with regard thereto in the following language:

"Giving due consideration to all of the differences and discrepancies in the testimony, considering the interests, considering the status of the different witnesses and their business motives, interests, and disinterests, I am constrained to believe that while there were no direct reports of a large storm brewing or approaching, there were very many indications that rain and wind probably of a temporary and perhaps of a serious character were to be expected. Many careful observers expected bad weather. A number of experienced waterfront men so testified, particularly the pilot Captain Igoe, Captain Webb, a retired Merchant Marine Commander, Mr. Hutson, familiar with the waterfront, Mr. Pringle an ex-airplane pilot, and many others. They of course did not know that a serious storm would hit the locality but they were prudent enough, in view of the weather that they saw, to feel that there was a strong probability, and danger, of a bad storm. And if those in charge of the Nicaragua Victory had had the same prudent foresight and had exercised ordinary prudence, this catastrophe would never have happened."

There is no question as to the law applicable to this portion of the case. It is clear that action was properly brought under the Tort Claims Act instead of the Public Vessels Act, 46 U.S.C.A. § 781. State of Maine v. United States, 1 Cir., 134 F.2d 574, certiorari denied 319 U.S. 772, 63 S.Ct. 1437, 87 L.Ed. 1720. There was no fault imputable to those in charge of the bridge, and the vessel must be held responsible for the damage resulting from the collision "unless she can show affirmatively that the drifting was the result of inevitable accident, or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented." The Louisiana, 3 Wall. 164, 18 L.Ed. 85; The Newa, 4 Cir., 267 F. 115. The question is one of fact, i. e. whether the collision was the result of inevitable accident or was due to the negligence of those having the vessel in charge. After a careful study of

the evidence, we think that the District Judge has found correctly that it was due to their negligence. Certainly, there is no basis upon which we would be justified in setting aside the finding as clearly wrong. See Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. Maryland Casualty Co. v. Rickenbaker, 4 Cir., 146 F.2d 751, 752; Guilford Construction Co. v. Biggs, 4 Cir., 102 F.2d 46, 47.

 The right of the insurance companies to recover under the Tort Claims Act, where it appears that they have compensated the Highway Department in part for the loss sustained, and where they have joined in the suit instituted by the Department in their behalf as well as for its own benefit, seems too well settled by recent decisions to admit of argument. See Aetna Casualty & Surety Co. v. United States, 2 Cir., 170 F.2d 469; Yorkshire Ins. Co. v. United States, 3 Cir., 171 F.2d 374; Old Colony Ins. Co. v. United States, 6 Cir., 168 F.2d 931; Employers' Fire Ins. Co. v. United States, 9 Cir., 167 F.2d 655; Insurance Company of North America v. United States, D.C., 76 F.Supp. 951; Niagara Fire Ins. Co. v. United States, D.C., 76 F.Supp. 850; Grace, to Use of Grangers Mut. Ins. Co. v. United States, D.C., 76 F.Supp. 174; Wojciuk v. United States, D.C., 74 F.Supp. 914; and Hill v. United States, D.C., 74 F.Supp. 129; where the matter is fully discussed. Some question might arise in a proper case as to the right of an insurer who had paid only a part of the loss to maintain an independent action for the recovery of the amount paid; for this would involve the splitting of a cause of action. See opinion of Judge Chesnut in Grace, to Use of Grangers Mut. Ins. Co., v. United States, D.C., 76 F.Supp. 174, 178, and cases cited. Nothing of the sort is involved here, however, as all of the parties have joined in a single action. The suit of the Highway Department is in behalf of itself and the insurers; and the right of these to share in the recovery cannot be less by reason of their having been made parties also in their own right. Nor does it afford any ground of complaint to the defendant that judgments were entered in behalf of the insurers, instead of in favor of the Highway Department for their use and benefit, as to the portion of the recovery to which they are entitled. No objection appears to have been made to the form of judgment; and we have long since passed the time in this country when judgments will be reversed for technicalities of this sort not affecting the substantial rights of the parties. R.C.P. 61.

 The right to recover under the Federal Tort Claims Act depends, of course, upon the right under the law of the state to recover from a private person under like circumstances. That Act provides that, with certain specific exceptions, the United States shall be liable for damages caused by any employee of the government "under circumstances where the United States, if a private person, would be liable to the claimant for such damage * * * in accordance with the law of the place where the act or omission occurred" and that "the United States shall be liable in respect of such claims to the same claimants, in the same manner, and to the same extent as a private individual under like circumstances." Sec. 410(a) [1948 Judicial Code, 28 U.S.C.A. §§ 1346, 2674]. There can be no question but that the law of South Carolina, as well as that generally applied throughout the United States,[2] recognizes the right of an insurer to recover, by way of subrogation, for damages that he has been called upon to pay to an insured under his policy. The rule is thus stated by Mr. Justice Fishburne in Globe & Rutgers Fire Ins. Co. v. Foil, 189 S.C. 91, 200 S.E. 97, 101:

"An insurer, after paying a loss incurred by the insured, is subrogated to all the rights of the assured, against the person whose tortious act has caused the loss. Mobile Ins. Co. v. Columbia & G. R. Co., 41 S.C. 408, 19 S.E. 858, 44 Am.St.Rep. 725. And an action may be brought by the insurer against the third person causing the loss without taking an assignment of the owner's claim or being formally subrogated to his rights; and it is immaterial whether

[2] See Standard Marine Ins. Co. v. Scottish Metropolitan Assur. Ins. Co., 283 U.S. 284, 287, 51 S.Ct. 371, 75 L.Ed. 1037; Crab Orchard Improvement Co. v. Chesapeake & O. R. Co., 4 Cir., 115 F.2d 277, 281.

such right of subrogation was stipulated in the contract or not. Pelzer Mfg. Co. v. Sun Fire Office of London, 36 S.C. 213, 15 S.E. 562.

"The doctrine of subrogation in insurance does not primarily arise from, nor is it dependent upon statute, or any of the terms of the contract. It has its origin in general principles of equity, and the nature of the contract of insurance. In fact, it would be applied or not according to the dictates of equity and good conscience, and considerations of public policy, resting, as it does upon the maxim that no one should be enriched by another's loss. As a general rule, therefore, applicable to insurance and indemnity contracts of all kinds, the insurer, on paying to the insured the amount of the loss of the property insured, is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss. Rawls v. American Central Ins. Co., 97 S.C. 189, 81 S.E. 505; Couch on Insurance, Sec. 1997.

"Where the tortious conduct of a third person is the cause of a loss covered by an insurance policy, the insurer, upon payment of the loss, becomes subrogated pro tanto by operation of law to whatever rights the insured may have against the wrongdoer. Rivers v. Liberty Nat. Bank, 135 S.C. 107, 133 S.E. 210; Sumter Trust Company v. Sumter County, 136 S.C. 15, 134 S.E. 209.

"That the doctrine of subrogation goes to the extent of giving the insurer who has paid the insurance the benefit of the rights and remedies of the insured against a third person whose tortious act has occasioned the loss, is asserted by eminent text writers and sustained by the authority of many decided cases."

■ It is argued that, although a subrogated insurer falls squarely within the language of the statute, he should not be accorded its benefit, since it is a statute waiving sovereign immunity and should be strictly construed. In our opinion, however, this would be to limit the meaning of the statute without sense or reason and to write into it an exception foreign to its entire spirit and purpose, which was to relieve Congress of the burden of dealing by private acts with tort claims. State of Maryland to Use of Burkhardt v. United States, 4 Cir., 165 F.2d 869; United States v. Chicago, R. I. & P. R. Co., 10 Cir., 171 F.2d 377. Bills to reimburse insurance companies for losses sustained as the result of torts of federal employees have just as much merit and cause just as much trouble to Congress as bills to reimburse the party originally injured; and there was just as much reason to give the courts the power to pass upon one class of claims as upon the other. It is worth noting that the Suits in Admiralty Act, 46 U.S.C.A. § 741, and the Tucker Act, 28 U.S.C.A. § 250(1) [now § 1491], the language of which in permitting suits against the United States is very similar to that of the Tort Claims Act, and which make no express provision for suit by subrogees, are uniformly held to give subrogees the right to recover.[3]

■ It is said that to permit suit by subrogees will result in the splitting of causes of action and in denying to the United States the right of setoff and counterclaim provided for by 28 U.S.C.A. § 1346(c); and that, for this reason, Congress could not have intended to authorize suits by or in behalf of subrogees. We see nothing whatever in this argument to justify our ignoring the plain words of the statute. So far as the right of setoff and counterclaim is concerned, the rights of the subrogee to recover cannot rise above those to whose rights he has been subrogated. United States v. Munsey Trust Co., 332 U. S. 234, 239, 240, 67 S.Ct. 1599, 91 L.Ed. 2022. And no great hardship is involved in suing in another case for recovery on a counterclaim which exceeds the claim of the subrogee. So far as the splitting of causes of action is concerned, this is a mat-

[3] United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022; United States v. American Tobacco Co., 166 U.S. 468, 474, 17 S.Ct. 619, 41 L.Ed. 1081; Prairie State Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; United States Fidelity & Guaranty Co. v. United States, D.C., 56 F.Supp. 452, 453; affirmed 2 Cir., 152 F.2d 46; Phoenix Ins. Co. of Hartford v. United States, D.C., 3 F. Supp. 112; Coal Operators Casualty Co. v. United States, D.C., 74 F.Supp. 236.

ter to be handled under the Rules of Civil Procedure relating to consolidation of actions and the adding and dropping of parties and in the light of the rule that an insurer who has paid only part of the loss must ordinarily recover in a suit brought in his behalf by the insured. Yorkshire Ins. Co. v. United States, 3 Cir., 171 F.2d 374; Grace, to Use of Grangers Mut. Ins. Co. v. United States, D.C., 76 F.Supp. 174, 178. We need not concern ourselves with the matter here, however, as all claimants have joined in one action and the injured party has brought suit in behalf of subrogated insurers as well as itself.

With respect to two of the insurance companies it is argued that they may not recover since they are foreign companies. There is nothing in the statute, however, which would justify a court in denying the fundamental justice involved in the equity of subrogation to a foreign insurer; and, if Congress had intended any such thing, provision should and would have been made to that effect. The statute contains no provisions limiting its benefits to citizens of the United States. The government cites 28 U.S.C.A. § 261 [now § 2502], which provides that aliens who are citizens or subjects of any government which accords to citizens of the United States the right to prosecute claims against such government shall have the privilege of prosecuting claims against the United States in the Court of Claims. Tucker Act suits are governed by this requirement (Choremi v. United States, D.C., 28 F.2d 913), so also are suits under the Public Vessels Act, which contains an express reciprocity provision. 46 U.S.C.A. § 785. The Suits in Admiralty Act, like the Tort Claims Act, contains no such reciprocity requirement; and alien libellants sue under it without plea or proof of reciprocity. Lauro v. United States, 2 Cir., 162 F.2d 32, 35; Kunglig Jarnvagsstyrelsen v. United States, 2 Cir., 19 F.2d 761; Galban Lobo v. United States, 2 Cir., 18 F.2d 221. There is no more reason to require compliance with the reciprocity requirement under the Tort Claims Act than under the Suits in Admiralty Act. If, however, the reciprocity requirement should be thought to have application to suits under the Tort Claims Act, we think that it has been fully met here. The two foreign insurance companies are corporations of Canada and England respectively; and it clearly appears from the proof of the law of those countries contained in the record that suits of this sort by foreign corporations could be maintained against them in their courts under a procedure which satisfies the requirements of the reciprocity statute. See United States v. O'Keefe, 11 Wall. 178, 20 L.Ed. 131.

Finally, it is argued that recovery by the insurance companies as subrogees is forbidden by the anti-assignment statute, 31 U.S.C.A. § 203. That statute, however, has reference to voluntary transfers or assignments of claims against the United States, not to transfers by operation of law or to equitable subrogation. Western Pac. R. Co. v. United States, 268 U.S. 271, 45 S.Ct. 503, 69 L.Ed. 951; Price v. Forrest, 173 U.S. 410, 421, 19 S.Ct. 434, 43 L.Ed. 749; Goodman v. Niblack 102 U. S. 556, 560, 26 L.Ed. 229; Morgenthau v. Fidelity & Deposit Company, 68 D.C.App., 163, 94 F.2d 632. See also, United States Fidelity & Guaranty Co. v. City of Asheville, 4 Cir., 85 F.2d 966, 972, a decision of this court in a case involving the assignment clause of sec. 24(1) of the Judicial Code, 28 U.S.C.A. § 41(1) [now § 1359]. That the assignment statute has no application to suits by subrogees under the Tort Claims Act has been repeatedly held after the most careful consideration. Old Colony Ins. Co. v. United States, 6 Cir., 168 F.2d 931, 934; Employers Fire Ins. Co. v. United States, 9 Cir., 167 F.2d 655, 657; Aetna Casualty & Surety Co. v. United States, 2 Cir., 170 F.2d 469; Yorkshire Ins. Co. v. United States, 3 Cir., 171 F.2d 374; Grace to Use of Grangers Mut. Ins. Co. v. United States, D.C., 76 F.Supp. 174, 175; Insurance Co. of North America v. United States, D.C., 76 F.Supp. 951, 954; Niagara Fire Ins. Co. v. United States, D.C., 76 F. Supp. 850, 856; Wojciuk v. United States, D.C., 74 F.Supp. 914, 915.

We think that the points raised by the defense have as little real merit as they have technical validity. The government has very properly decided to waive immunity and subject itself to suit for the

900

wrongs committed by its agents and servants, with certain definite exceptions, just as though it were a private person or corporation. Where an insurance company has indemnified the injured person for the loss that he has sustained because of the wrong, there is no reason in law or in common sense why it should not be subrogated pro tanto to the rights of the injured party, just as though the suit were against a private person. It is inconceivable that the fact that the injured party has insurance should affect his right to recover in tort against the government, or that the recovery for property damage should not go to the insurer to the extent that he has reimbursed the injured party rather than to the latter. Certainly, it could not have been intended either that recovery for a loss be denied because the injured party has been prudent enough to insure against it or that recovery be allowed where the insurer has paid the loss except for his reimbursement.

There was no error and the judgment appealed from will be affirmed.

Affirmed.