EASTERN AIR LINES, Inc. v.
UNITED STATES.
Civ. A. No. 1055.

United States District Court
D. Delaware.

Dec. 1, 1952.

See also 110 F.Supp. 499.

---

19. Oliver Twist Chapter LI.

20. See also San Juan Light & Transit Co. v. Requena, 224 U.S. 89, 32 S.Ct. 399, 56 L.Ed. 680.

William Bennethum, of Morford, Bennethum, Marvel & Cooch, of Wilmington, Del., and Joseph Henderson, of Rawle & Henderson, of Philadelphia, Pa., for plaintiff.

James L. Latchum, Asst. U. S. Atty., of Wilmington, Del., and James B. Spell, Sp. Asst. to the Attorney General, for defendant.

LEAHY, Chief Judge.

1. Plaintiff, Eastern Air Lines, Inc., is a Delaware corporation. Defendant is the United States of America.

On July 12, 1945, plaintiff was owner of an aircraft known as a Douglas DC-3, registered with the appropriate agencies of the Government, bearing U. S. Registry No. NC–25647.

On July 12, 1945, defendant was owner of a certain Army aircraft known as an A–26, bearing Army Serial No. 44–35553.

On July 12, 1945, plaintiff's aircraft was being operated upon a duly scheduled commercial flight.

The commercial plane having aboard seventeen passengers, three children, one an infant, and a crew of four, while on a trip from New York to Miami, and then in the vicinity of Florence, South Carolina, was struck in mid-air by the United States Army bomber, when the pilot was practicing military maneuvers. A skillful and courageous crew brought the damaged Eastern airliner to a successful and dramatic forced landing in a cotton field, thereby saving the lives of all aboard the plane, with the exception of the infant. It was killed by the impact and the flying debris from the bomber. For the loss of its airplane, Eastern has brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 (b) and 2671, to recover the value, which has been admitted to be $95,500.

The sole fact question for decision is whether the Army bomber was operated negligently, so as to cause the fateful collision; and, whether plaintiff was free from contributory negligence.

Captain Gaston D. Davis, Eastern's pilot, who has been a pilot since 1926, with 13,000 to 14,000 flying hours in the air at the time of the trial, and 6,000 to 7,000 flying hours in the air at the time of the

accident, at trial, said: "Well, I saw the Army plane, I guess—I would say a split second, I will say a split second before the impact. He was on my left, at least ninety degrees from a forward point, ninety degrees to the left and maybe a little more than ninety degrees back from my angle of sight, being zero in front of you, going counter-clockwise around to ninety degrees or better to my left. He appeared to be in a slightly gliding or diving attitude. I had such a slight sight of him I don't have any idea where he came from or what he was doing prior to that."

Mr. Odom, an impartial witness who observed the collision from the ground, testified:

"Q. Now, Mr. Odom, immediately before the impact as you observed these craft before they actually collided, was the bomber behind or in front of the left wing of the airliner? A. Behind it."

On that Sunday, defendant's aircraft was operated by First Lieutenant Stephen G. Jones, then on active duty, pursuant to orders, upon a regularly assigned training mission, and acting within the scope of his employment by defendant. Norman Lawrence Martindale was second pilot or co-pilot for the airliner.

Plaintiff Eastern operates as an air carrier under a certificate of public convenience and necessity issued pursuant to the Civil Aeronautics Act of 1938, as amended. Eastern is authorized to engage in air transportation with respect to persons between various points, including Boston, New York, Washington, Columbia, South Carolina, Jacksonville, Florida and Miami, Florida. Eastern's Flight 45 that Sunday, July 12, 1945, was scheduled to depart from Boston at 8:55 A.M. and terminate at Miami. On this flight, Airplane DC-3, No. NC-25647, departed from Boston at 8:55 A.M.; arrived in New York at 10:00 A.M.; departure was made from New York at 10:30 A.M. and arrived at Washington at 12:03 P.M.; departure from Washington was made at 12:22 P.M., having been delayed three minutes in placing an ill passenger on board.

Defendant's Douglas DC-3 was properly certificated at the time of the collision, and the captain and co-pilot were likewise properly certificated and qualified for the duties of Flight No. 45. At the time of the accident, Captain Davis had, with respect to his plane, 3,000 or 4,000 hours of flying a DC-3 type of aircraft. He also held a certificate of the CAA as Airline Transport Pilot, Land, 80 to 3,650 horsepower; no waivers. Captain Davis was familiar with the route which he was flying, having traversed it at least 5 times a month for a considerable period of time prior to the accident. Plaintiff's aircraft was being flown upon a VFR flight clearance (contact flight, visual reference to the ground, as opposed to an instrument flight clearance). When plaintiff's plane arrived and was crossing Pee Dee River, South Carolina, Captain Davis took the controls from Co-Pilot Martindale. It was customary for airline pilots, in the exercise of due care, to fly slightly to the right of the civil airway when in the vicinity of Florence, South Carolina since the aircraft would then pass to the right of the Florence Army Base which, to the best of Captain Davis' knowledge, from his past experience, was a congested area in which Army pilots were training for wartime duties. In fact, it was customary to fly to the right of this airway, not only to avoid the heavy air traffic in the vicinity of the Florence Army Air Base, but to avoid heavy air traffic in the vicinity of Fort Sumter, Shaw Army Air Field and Congaree Field, all of which were in the vicinity.

At the time of the accident, which occurred at 2:40 or 2:41 P.M., plaintiff's plane was in an unqualified legal area, where it had an absolute right to be. The area had not been in any wise designated by the CAA, or any other agency of the United States Government, as restricted, forbidden or as a danger zone.

The accident occurred at a point between Darlington and Lamar, South Carolina. A "Notice to Airmen" issued by CAA, at the time of this accident, provided commercial pilots were advised to use caution

while flying within a 25-mile radius of an Army Flying Base, but were not restricted to flying in some other flight area to avoid an Army base. Plaintiff's airplane was at an altitude of approximately 3,100 feet, and its indicated air speed was approximately 175 miles per hour, while defendant's airplane was being operated at an indicated air speed of 220 miles per hour.

Visibility was approximately 10 miles or better. Skies were clear, with the exception of a few scattered clouds.

Prior to collision, plaintiff's plane was being operated, as stated, to the right of the civil airway at a distance of about 6½ to 7 miles therefrom, and was descending at a rate of 200 feet per minute; a normal rate of descent of a commercial airliner with passengers aboard. It was proceeding on a magnetic heading of approximately 240 degrees, which is, in fact, a southwesterly heading. Captain Davis first saw the Army bomber over his left shoulder a split second before the impact, and at a time when the Army bomber was to Captain Davis' left at an angle of, at least, 90 degrees or better from a forward point of plaintiff's plane, counting degrees from the nose of the airliner in a counter-clockwise manner. When Captain Davis first saw the Army bomber, it was in a slightly diving or gliding attitude. The Army bomber apparently approached plaintiff's plane from the left and from the rear. Captain Davis instantly took necessary action to avoid an imminent collision.

The wings of the Eastern airliner, it was shown, taper rearward from a point just beyond the engines, the sweepback being at a 15 degree angle. The first point of impact between the two planes was the vertical fin or the vertical portion of the tail section of the Army bomber with the leading edge of the left wing of the airliner, the right side of the fin scraping along the leading edge of the wing in the direction of the left engine nacelle of the Eastern airliner. The vertical fin of the Army bomber then severed the left engine of the airliner, striking it at the spar or root; the Army bomber then passed directly underneath and passed partially under the right wing and slightly forward. The top gun turret and tail cone of the Army bomber, in passing underneath the airliner, struck the right propeller and knocked it off and also damaged the dome section of the propeller. The angle of departure of the Army bomber from the airliner was approximately 110 degrees, counting counter-clockwise from the nose of the airliner. Based upon the testimony both for and against plaintiff and defendant, as to the position of the planes at the point of collision, the angle of approach of the Army bomber to the airliner was, therefore, approximately from 90 to 110 degrees measured counter-clockwise from the nose of the airliner.

Human remains and blood were found, after the accident, beneath the entire length of the right wing of the airliner, resulting from the Army gunner being killed—his head was cut off—when the top gun turret of the bomber came into contact with the right propeller of the airliner. The observer of the Army bomber also met death that afternoon. Note: there were cuts in the gasoline tanks of the airliner which are located on the underside of the Eastern plane between the two engines.

The initial impact between the two planes caused parts of the tail section of the Army bomber to become lodged in the left side of the fuselage of the airliner, and particularly in the baggage section of the airliner which is forward of the leading edge of the airliner's left wing. Certain parts of the left horizontal stabilizer and elevator were found after the accident in the baggage compartment of the airliner; the baggage compartment is forward of the wings of the airliner, and such was the result of those parts of the Army bomber being thrown into the area already damaged by the left engine and left propeller of the airliner as it was forced into its own fuselage.

As a result of collision, plaintiff's pilots found themselves without the use of either engine, with all controls rendered useless, except the elevator and ailerons. Plaintiff's pilots were forced to make an immediate landing. Because of the skill and experi-

ence of Captain Davis and Pilot Martindale, plaintiff's airplane, with its passengers, was brought to successful emergency landing in a cotton field in the vicinity of Lumberton, South Carolina. But, as a result of collision, and not of the emergency landing, one passenger, a child, was killed; the death, as stated, was the result of flying debris from the bomber at the time of impact.

The left engine of Eastern was found in the vicinity of the point at which its plane made the emergency landing with its propeller blades intact, the tips of the blades only being bent due to their contact with the earth. Had the vertical fin of the Army bomber struck the leading edge of the left wing of Eastern at an angle of approach of 60 degrees, as implied by defendant, the left wing would have been severed to a great extent as a result of the momentum of the Army bomber; or, had the vertical fin of the Army bomber, approaching the airliner at an angle of 60 degrees to the left of the nose, struck the left engine of the airliner, the propeller of the engine would have been destroyed and would have been torn loose from the engine itself; or, had the vertical fin of the Army bomber approaching the airliner at an angle of 60 degrees to the left of the nose, as testified by Lt. Jones, struck the left wing of the airliner at such angle, the left wing would have been cut off completely.

2. Now, upon an occasion prior to the accident—April 20 of the same year—Captain Davis was "buzzed" by an Army aircraft in the vicinity, between Shaw Field and Lumberton, South Carolina.

In a DC-3 aircraft the pilot and co-pilot are seated side by side, each having a window or windshield in front of him, and a side window extending back to a bulkhead, which bulkhead is immediately behind the seats. Neither pilot nor co-pilot can see outside the plane behind himself.

On this day, time elapsing between the time of initial impact and the time when defendant's plane passed underneath the fuselage of plaintiff's plane and to the front of the right wing of plaintiff's plane, was insufficient for the force of the impact to cause the airliner to "yaw" or turn to the right to any extent to avoid the accident.

After impact, the right engine of Eastern was seen to be smoking, but neither the pilot nor the co-pilot was able to reach the fire extinguisher control, which was located between the pilot and co-pilot, because baggage stored behind the pilot's seat in the baggage compartment had been knocked, by the force of the impact, into the space between the seats. The infant who was killed by force of the impact was seated on the left side of the Eastern plane at the second window. The findings of the master facts having been treated, I now give my further views of the evidence:

3. Lt. Jones' activities on the date of the accident must be looked at. His aircraft orders called for a military procedure. He was training for wartime flight. An aural null is the name given a radio navigation procedure, and requires a series of maneuvers which must be done in sequence in order to accomplish the desired results. The initial maneuver of the aural null procedure is to make a turn either to the left or to the right until a null is received through the radio receiver, and this cannot be accomplished until the initial step has been done. A series of turns to the left and to the right alternately will not allow the pilot to proceed with the successful accomplishment of the aural null procedure, since the null can be picked up in the original turn, and the next step of the procedure after picking up the null is immediately to make the necessary correction in order to maintain the plane in level flight and for proceeding straight ahead. The practicing of the aural null procedure requires the use, both of the instruments of the plane and the control of the radio loop antenna involved.

The visibility from the cockpit of the Army bomber, in a 20 to 30 degree bank to the left, is approximately 65 degrees to the right, counting from the nose of the Army bomber. When, in the accident here involved, the vertical fin of the Army bomber struck the leading edge of the left wing of the airliner, and for a split second hit the left engine nacelle, the forward portion of the Army bomber was underneath the

fuselage of the airliner. The turret of the Army bomber was directly beneath and crashing into the right propeller of the DC-3. It thus established an angle of approach by the Army bomber in excess of 90 degrees computing counter-clockwise from the nose of the airliner.

Based upon air speeds, the Army bomber was traveling at least 25% faster than the airliner; and based upon air speed of both planes, the Army bomber could have approached the airliner from a position to the left and rear of the airliner. Based upon points of contact of the respective parts of both planes and based upon the true air speed of both planes, the Army bomber approached the airliner from a position to the left, and rear of the airliner, the angle of approach at contact being approximately 90 or 110 degrees measured counter-clockwise from the nose of the airliner. Based upon the air speeds of the two planes, the Army bomber could have overtaken the airliner from behind traveling upon a parallel course and then have turned to the right or starboard and collided with the airliner at approximately the angle of 110 degrees measured counter-clockwise from the nose of the airliner.

The normal range of vision laterally in an A-26 (Army bomber) from the pilot's seat is from 130 to 140 degrees to the left and from 90 to 95 degrees to the right.

Lt. Jones was making S turns of figure 8's prior to the accident. Based upon expert testimony in this case, making of S turns or figure 8's has no air significance to loop orientation aural null work.

4. A-26 airplanes of the same type as the Army plane involved in this collision were sold by the United States Government in 1946 as surplus property for amounts between $3,500 and $4,500. This statement is made and directed to defendant's counterclaim of $193,557.56, which includes an item for funeral expenses incurred by defendant on behalf of the enlisted men killed in the Army bomber.

The value of Eastern's airliner, No. NC–25647, at the time of collision was $100,000. As a result of collision, the plane had a salvage value of $4,500; so damages which plaintiff suffered as a result of the collision are $95,500.

5. The law of South Carolina, the place where the collision occurred, controls on the question of negligence.[1] Federal courts have construed the Federal Tort Claims Act to mean that the law of the state where the negligent act took place determines the question of whether a claim has been established and the extent of recovery. Van Wie v. U. S., D.C., 77 F.Supp. 22, 23; Washabaugh v. U. S., D.C., 83 F.Supp. 623; Olson v. U. S., 8 Cir., 175 F.2d 510, 512; U. S. v. South Carolina State Hy. Dept., 4 Cir., 171 F.2d 893, 897; Fries v. U. S., 6 Cir., 170 F.2d 726, 730.

In South Carolina the laws relating to the operation of airplanes, with respect to negligence, are similar to those which relate to the operation of vehicles. In short, the ordinary rules of negligence apply; that is, an automobile driver or a pilot in an airplane must use that degree of care which an ordinarily careful person would use as the situation and circumstances demand.[2]

6. Plaintiff relies strongly on Martineau v. Eastern Air Lines, Inc., 14 F.R.D. 30, which was a private suit by the administrator of the estate of the army turret gunner brought against plaintiff Eastern, here, in the United States District Court for the Northern District of Illinois. In that case, the jury found a verdict in favor of Eastern. As the United States was not a party to that litigation, I conclude any reference to that particular litigation is irrelevant.

The weight of the evidence, both oral and mute, proves to me the Army bomber was approaching the airliner from the left and from the rear. In accordance with the CAA regulation, the airliner had the right-of-way. The duty to give way rested upon the bomber. As stated, in my findings

---

1. South Carolina has adopted the Uniform Aeronautics Act. See, in particular, §§ 7100 to 7112–42 of the 1942 Code of South Carolina.

2. Carroll v. Lumpkin, 146 S.C. 178, 143 S.E. 648; Crouch v. Cudd, 158 S.C. 1, 155 S.E. 136; Holcombe v. W. N. Watson Supply Co., 171 S.C. 110, 171 S.E. 604.

above, the bomber, just prior to collision, was in a diving attitude and was approaching the airliner at an angle of, at least, 90 degrees as measured from the nose of the airliner.

 Defendant argues plaintiff's negligence was the sole and proximate cause of the collision. Under South Carolina law, contributory negligence to any extent defeats recovery.[3] My finding, as stated above, is plaintiff was not guilty of any contributory negligence but the sole and proximate cause of the collision was defendant's negligence.

Also, as found above, the rear section of the bomber and the turret came in contact with the right propeller of the airliner. Blood and human remains appearing on the underside of the right wing of the airliner establish this.[4] Pilots, irrespective of regulations, the testimony shows, must be vigilant at all times. The evidence convinces me both Captain Davis and Pilot Martindale were vigilant. Moreover, Captain Davis, familiar with the area around the Florence Army Air Base, knew it was a congested area. He knew, too, the center of the airway allotted to the commercial plane passed directly over the Florence Field and, in the interest of safety, deviated to the right of the airway. His past experience in flying over this area gave him knowledge of young Army pilots flying their planes very close to the commercial planes in maneuvers known as "buzzing" or "making passes" at commercial planes.

Captain Davis was a pilot with 20 years' experience and thousands of hours in the air. On this occasion he knew he had 21 passengers, 3 of whom were children; and I am convinced he was vigilant for their safety. On the other hand, Lt. Jones testified in his deposition (he did not appear at the trial) that because he was in a 15 to 20 degree bank his view to his own right was practically 100% obliterated. There was no doubt he was practicing some wartime maneuvers. In fact, he himself described his descent on the airliner as a "species of dive-bombing".

Eastern had a splendid safety record up to the time of this accident.[5]

---

3. Gladden v. Southern Ry. Co., 142 S.C. 492, 141 S.E. 90; Whisenhunt v. Atlantic Coast Line R. Co., 195 S.C. 213, 10 S.E.2d 305; Coleman v. Lurey, 199 S. C. 442, 20 S.E.2d 65.

4. The direction from which the bomber approached the airliner, and the duty upon the bomber pilot, is imposed upon the pilot by the Civil Air Regulations:
 (a) Civil Air Regulation Part 60.103 (c) (1) states:
 "(c) *Right-of-way of similar type aircraft.*
 "*Converging.* When two aircraft are on crossing courses at approximately the same altitude, the aircraft on the left shall give way."
 (b) Civil Air Regulation Part 60.103 (c) (3) states:
 "An overtaken aircraft has the right-of-way and the overtaking aircraft whether climbing, descending or in level flight shall alter its course to the right."
 See, too, CAR No. 61.731, under Par. 9, infra, of text.

5. The figures which are quoted are for Eastern Air Lines, Inc., which was so organized the end of March 1938. Eastern of course flew millions of passenger miles prior to this time, which were flown with only four fatalities.

The total passenger miles flown from April 1938 through July 1945 were 1,527,869,696; during this time Eastern had nine fatalities.

During the period August 1945 through January 1952, Eastern flew an additional 7,365,372,474 passenger miles and had 166 fatalities.

The total passenger miles flown for the period April 1938 through January 1952 was 8,893,242,170, and total fatalities were 175.

Transposing these figures to percentages, I find the percentage of fatalities per passenger miles flown for the period April 1938 to July 1945 was .00000000589, for the period August 1945 through January 1952 it was .00000002254, and the total operations for April 1938 through July 1952 becomes .00000001968.

Of these 175 fatalities, 71 or approximately 41% were caused directly or indirectly by Military Aircraft.

One fatality in the July 1945 accident, 15 fatalities July 30, 1949, when an Eastern ship was hit by a Navy Aircraft over Fort Dix, N. J., and 55 fatalities caused when an Eastern ship was hit over Washington by a Bolivian Government employee, test hopping a plane of a Military type being purchased by his Government.

■ 7. Prior to trial, I entered an order, over defendant's objection, for the production of a confidential investigation file made by the Air Force Inspector General. Defendant argues that error was committed for the reason that good cause was not shown for the production under Fed.Rules Civ.Proc. rule 34, 28 U.S.C.A. I think good cause was shown and that Reynolds v. U. S., 3 Cir., 192 F.2d 987, controls. Therefore, I consider this report to be competent evidence, although not controlling the decision in the case at bar.

■ 8. Objection was also made, at trial, by the government to the introduction in evidence of "the Booth Letter". This was a letter written by Gen. Donald P. Booth, Executive in the Office of the Under Secretary of War, dated August 7, 1946, to Associated Aviation Underwriters. The writer of the letter admitted contributory negligence on the part of the government with respect to the collision in question. While I admitted the letter in evidence, I recognize Gen. Booth was not employed to make any such declaration so as to bind the government. And unless he had authority to make such admissions, his statements can have no probative value to assist in the decision of this case.[6]

9. Plaintiff's pilots were where they had a legal right to be. CAR No. 61.731 covers this question and provides as follows:

"*Deviation from airway.*

"No scheduled air carrier aircraft shall deviate from its prescribed airway, or, if there be no airway, from an area between two lines parallel to and 5 miles on either side of the center of the authorized route, except when operating in accordance with instructions issued by a certificated air-traffic control-tower operator or when circumstances render such deviation necessary as a safety measure. Any deviation of more than 25 miles on either side of the center line of the prescribed airway of authorized route shall be explained by the pilot in a written report to the Administrator of Civil Aeronautics. Such report shall be made within 7 days after the completion of the flight." Captain Davis, not having deviated from the airway to the extent of 25 miles, was not obliged to file any written report. The law gives to the pilot the right, in his own discretion, to deviate from the airway *in the interests of safety.*

10. My conclusion is plaintiff has by the preponderance of the evidence met the burden of proof and sustained its claim for damages. Defendant shows that the cost of the A-26 was $195,357. Defendant argues where property, such as the Army bomber, had no market value then its actual or intrinsic value should be considered. It is useless to give consideration to the value of the Army bomber since the counterclaim is to be dismissed.

## Conclusions of Law

1. Prior to collision, Captain Davis and Pilot Martindale were vigilant and exercising due care in the operation of plaintiff's airplane.

2. Plaintiff's airliner was, at the point of collision, in a location completely lawful.

3. Captain Davis and Pilot Martindale were guilty of no negligence.

4. Lt. Stephen G. Jones was acting within the scope of his employment.

5. Lt. Jones, having piloted his plane in such manner as to place it on a crossing course with the airliner and to its left, was negligent in that he did not "give way" as provided in Civil Air Regulations Part 60.103(c) (1).

6. Lt. Jones, having overtaken the airliner from a position to the rear of the airliner, was negligent for he failed to alter his course as provided in CAR Part 60.103(c) (3).

7. Captain Davis acted with due care. He was in no manner negligent in deviating from the airway, in the interests of safety, as provided in CAR Part 61.731(b).

6. Waters v. U. S., 4 Ct.Cl. 389, 391; U. S. v. Foster, 8 Cir., 131 F.2d 3, 7; Whiteside v. U. S., 93 U.S. 247, 257, 23 L.Ed. 882; Hawkins v. U. S., 96 U.S. 689, 691–692, 24 L.Ed. 607; U. S. v. Willis, 4 Cir., 164 F.2d 453, 455; Farm Security Administration v. Herren, 8 Cir., 165 F. 2d 554, 564, certiorari denied 333 U.S. 875, 68 S.Ct. 904, 92 L.Ed. 1151.

8. Negligence of defendant's agent, Lt. Jones, was the sole and proximate cause of the collision.

9. Defendant, by its agent, being negligent, his negligence bars a recovery upon defendant's counterclaim. The counterclaim is dismissed.

10. Under all the evidence and applicable law, plaintiff is entitled to a finding against defendant in the amount of $95,500, being the undisputed value, less salvage, of its airliner at the time of the accident.